HAUPT, INC., et al., Appellants,

v.

TARRANT COUNTY WATER CONTROL
AND IMPROVEMENT DISTRICT
NUMBER ONE, Appellee.

No. 10–91–150–CV.

Court of Appeals of Texas,
Waco.

July 1, 1992.

Rehearing Denied Aug. 5, 1992.

## OPINION

THOMAS, Chief Justice.

In May 1989 the Richland–Chambers Reservoir in Navarro County finally reached its normal pool elevation of 315 feet. Tarrant County Water Control and Improvement District Number One, which developed and operates the lake, had previously condemned the surface estates below that elevation. Frances Breithaupt and her sister, Lillian Weiss, joined by Frances' son (James Breithaupt, III) and two of Frances' closely held corporations (Bar J B Company, Inc. and Haupt, Inc.), sued the Water District for unconstitutionally taking or damaging their interests in the minerals under an eighty-acre tract partially inundated by the lake. The lake inundated sixty-seven of the eighty acres.

The court held a separate trial on whether the Water District had inversely condemned the minerals. Following a bench trial, the court ruled that the Water District had taken Frances' and Lillian's interests in 1987 but had not taken or damaged James' and the corporations' interests. It then severed Frances' and Lillian's actions from those of the other plaintiffs and ordered another trial to determine the damage to Frances' and Lillian's interests. Frances and Lillian did not appeal, but James and the corporations appeal the judgment denying them any recovery.

We hold that the evidence conclusively established an inverse condemnation of all of the plaintiffs' interests when the Water District inundated the eighty-acre tract in May 1989. Because the plaintiffs' interests are intertwined, we reverse the judgment in its entirety and render judgment for all the plaintiffs on the question of inverse condemnation. We also remand all of the plaintiffs' causes for a trial on damages.

### INVERSE CONDEMNATION

The Water District's condemnation of the surface in 1981 resulted in a severance of the mineral estate. *See Chambers–Liberty Counties Navigation Dist. v. Banta*, 453 S.W.2d 134, 137 (Tex. 1970). Condemnation of the surface did not automatically take or damage the mineral estate as long as the common-law right to access the minerals through reasonable use of the surface remained unimpaired. *See id.* However, if the Water District later damaged the mineral estate by interfering with the right of access without initiating condemnation proceedings, that would constitute a separate taking of the minerals by inverse condemnation. *See id.* This is what occurred.

Inverse condemnation occurs whenever property is "taken" or "damaged" for public use without adequate compensation. TEX. CONST. art. I, § 17; *City of Abilene v. Burk Royalty Company*, 470 S.W.2d 643, 646 (Tex.1971). Property is damaged within the meaning of the constitutional provision whenever its value is diminished by a material and substantial impairment of the right of access. *City of Waco v. Texland Corporation*, 446 S.W.2d 1, 2 (Tex.1969). A material and substantial impairment can occur even though all reasonable access has not been restricted. *Id.* A material and substantial impairment of access must arise, however, from either (1) a total but temporary restriction, (2) a partial but permanent restriction, or (3) a temporary limited restriction resulting from an illegal activity or one negligently performed or unduly delayed. *City of Austin v. Avenue Corp.*, 704 S.W.2d 11, 13 (Tex. 1986). The court determines as a question of law whether the requisite impairment of access has occurred. *Texland Corporation*, 446 S.W.2d at 2.

## DETERMINATIVE ISSUE

The plaintiffs contended in the trial court that flooding the surface of sixty-seven of the eighty acres so restricted their access to the minerals that it diminished their value, which resulted in an inverse condemnation of their interests in the minerals. Essentially, the Water District argues that inundating the surface did not take or damage the minerals because they could be accessed either by directional drilling from the shore or vertical drilling from a platform over the lake. The court found that Bar J B Company, Inc. and Haupt, Inc., which hold oil and gas leases covering the eighty acres, had access to the minerals by conventional- or directional-drilling methods.

■ The Water District's contention and the court's finding both miss the mark. Whether the minerals can still be reasonably accessed through directional or platform drilling is not the crucial issue. Property can be damaged for public use in the constitutional sense *even though all reasonable means of access have not been restricted. Id.* Therefore, just because the plaintiffs might have reasonable access to the minerals by directional- or platform-drilling methods does not dispose of the appeal in the Water District's favor. What is determinative, however, is whether inundating the surface diminished the value of the mineral estate by materially, substantially, and permanently restricting other reasonable means of access. *See Avenue Corp.*, 704 S.W.2d at 13 (holding that substantial and material impairment can result from a partial and permanent restriction of access). This will be the focus of our evidentiary review.

## CONCLUSIVE EVIDENCE OF DAMAGE

A brief sketch of the background facts will put the parties' contentions in perspective.

- In 1952 Frances and Lillian executed an oil and gas lease on the eighty-acre tract that was subsequently assigned to Four–W Oil Company.
- In 1981 the Water District condemned the surface of the eighty acres below 315 feet.
- In 1987 the Water District condemned the working interest of Four–W Oil under the 1952 lease without acquiring Frances' or Lillian's executive rights.
- In June 1987 the Water District plugged the two producing oil wells drilled by Four–W Oil under the 1952 lease, which terminated Frances' and Lillian's royalty payments.
- Bar J B Company, which acquired top leases on the eighty-acre tract from Frances and Lillian shortly before the wells were plugged, obtained a permit from the Texas Railroad Commission to re-enter the two plugged wells and began re-entry operations in August 1988.
- In August 1988 the Water District obtained a temporary injunction against Bar J B Company's re-entry drilling. (The court in its final judgment permanently enjoins Bar J B Company from any exploration or drilling operations on the eighty acres below 315 feet.)
- In May 1989 the lake inundated the plugged wells, which are located at an elevation of approximately 291 feet.
- In 1989, after inundation, Haupt, Inc.—which holds a lease on James Breithaupt's 1/6 mineral interest—attempted a directional well from the shore of the eighty-acre tract but was unsuccessful.
- Bar J B Company and Haupt, Inc. never attempted to drill a new well or reenter one of the plugged wells vertically from a platform either before or after inundation.
- A producing well (Fullwood No. 9) located on land adjacent to the eighty-acre tract had been vertically drilled from a platform prior to inundation.

James Breithaupt testified that inundating the surface had destroyed access to the minerals under the eighty acres, thus totally destroying their value, which he estimated at $3 million before inundation. Tim Taylor, a reservoir engineer, estimated the minerals' value at $1,802.166 before inundation and zero afterwards. A consulting petroleum engineer, Edward Ziegler, said that inundation had diminished the value of

the mineral estate from $1.6 million to zero because no marine oil-field equipment is available on the lake and because directional drilling costs are prohibitive. Ziegler's opinion was that the minerals could be tapped economically only through a vertical well drilled on dry land.

Moreover, Robert Ungerecht testified that inundating the surface had reduced the market value of recoverable reserves from $3.75 million to $937,500. This resulted, he said, from the loss of access by vertical drilling on dry land and because of the increased drilling and operating costs and increased risk associated with directional drilling. C.L. Brown, an experienced producer and operator of oil and gas interests, estimated the market value of recoverable reserves at $1.2 to $1.6 million before inundation and "close to zero" afterwards. Brown was the Water District's own expert.

Three other experts, Dan Duffy, Jack Summitt, and Forrest Garb, expressed opinions on the value of the plaintiffs' interests on the date of inundation. They did not express opinions on the value of the minerals before and after inundation.

Just as the Supreme Court noted in *Texland Corporation*, "[t]here are facts of impairment here." *See Texland Corporation*, 446 S.W.2d at 2. Although one might argue that the evidence does not establish a deprivation of *all* means of access, there is conclusive proof that inundation resulted in a permanent restriction of the most reasonable, lowest-risk, and most cost-effective means of access: vertical drilling from dry land. Moreover, the evidence conclusively established that, by inundating the surface for public use, the Water District damaged the mineral estate by diminishing its value through a substantial, material, permanent, partial restriction of access. This constituted an inverse condemnation of the plaintiffs' interests as a matter of law. *See* TEX. CONST. art. I, § 17; *Texland Corporation*, 446 S.W.2d at 2. Under the evidence presented, the finding that Bar J B Company and Haupt, Inc. had some access to the minerals under the eighty acres is immaterial.

Accordingly, the court erred when it ruled that the Water District took Frances' and Lillian's interests in the mineral estate in 1987, apparently when it condemned Four–W Oil's working interest and plugged the two producing wells. We discuss the legal effect of this action later in the opinion. The court likewise erred when it held that the Water District had not inversely condemned the interests of James Breithaupt, Bar J B Company and Haupt, Inc. and denied them any recovery.

## DISPOSITION

We sustain the first seven points of error, which attack the erroneous judgment that Frances' and Lillian's interests were taken in 1987 but that none of the other plaintiffs' interests were damaged. We do not, however, reach the eighth point attacking the court's legal conclusion that, by enjoining Bar J B Company in 1988 from drilling operations on the eighty acres, the Water District was merely exercising its police power to protect the lake from pollution rather than covertly taking the minerals. Nor do we reach point nine, alleging that the permanent injunction was improperly granted because the Water District had an adequate legal remedy by condemnation proceedings, due to reversal of the judgment.

Frances and Lillian did not appeal the judgment. Ordinarily, a reversal has no effect on a party who does not appeal. *Turner, Collie & Braden v. Brookhollow, Inc.*, 642 S.W.2d 160, 166 (Tex.1982). An exception exists, however, when a non-appealing party's interest is so intertwined with those of an appealing party that the entire judgment must be reversed to give the appealing party full and effective relief. *Id.*

Frances' and Lillian's interests are interwoven with those of Bar J B Company, which holds leases on their one-half mineral interests. If the erroneous portion of the judgment relating to Frances and Lillian stands, then Bar J B Company's top leases from Frances and Lillian would be a nullity and a reversal as to the company

would be in vain. Only by reversing the judgment in its entirety can Bar J B Company obtain full and effective relief from its reversal.

Therefore, we reverse the entire judgment and render judgment in favor of all the plaintiffs on the question of inverse condemnation. We vacate the permanent injunction against Bar J B Company, but the temporary injunction shall remain in effect until further order of the trial court. Because the court has ordered a separate trial on damages, we remand all of the causes for further proceedings.

Several comments in the Water District's brief cannot pass unnoticed. Counsel for the Water District offer this rationale for why the court refused to have it pay for the working interest of Bar J B Company under the top leases from Frances and Lillian:

> The Trial Court was most certainly aware that the Water District had condemned, and paid for, the working interest of Four–W Oil Company in the producing wells on the eighty (80) acre tract. *To require the Water District to pay Bar J B Company, Inc. for the working interest in the eighty (80) acre tract[,] which the Water District had already paid for as a result of the condemnation of the Four–W Oil Company working interest, would constitute a misapplication of public funds.* Even though the Appellants may not be concerned that the Water District would be forced to pay for something twice, the Trial Court was, evidently, keenly aware of this possibility and the Trial Court's Judgment avoids that irrational result.

(Emphasis added).

Considering the Water District's own minutes and the admission in its brief, we find that asserting this rationale for the court's ruling borders on contumacy. The Water District's minutes irrefutably reflect that it knew and appreciated the risk of merely condemning the working interest of a lease holder without acquiring the executive rights and cutting off the right of the mineral owner to execute other leases. The Water District knew that under those

circumstances it could be faced with having to repeatedly condemn working interests under subsequent leases on the same tract. Moreover, it concedes in its brief that Bar J B Company's top leases from Frances and Lillian are valid. Despite this demonstrated knowledge of the applicable legal principles and being faced with the risk envisioned, counsel nevertheless blatantly assert that requiring the Water District to condemn and pay for Bar J B Company's working interest would not only be a misapplication of public funds but an irrational result.

Lawyers occasionally resort to hyperbole in defending their client's position. In this instance, however, hyperbole crosses the line between credible argument and knowing misstatement.