HAUPT, INC., et al., Appellants,

v.

TARRANT COUNTY WATER CONTROL AND IMPROVEMENT DISTRICT NUMBER ONE, Appellee.

No. 10–91–150–CV.

Court of Appeals of Texas, Waco.

Feb. 16, 1994.

---

6. *See id.* § 154.021(a).

7. *See id.* § 154.021(b).

8. *See id.* § 154.023.

9. *See id.* § 154.051.

10. *See id.* §§ 154.051(b), 154.052.

11. *See id.* § 154.054.

Ron Edmondson, Dawson, Sodd, Moe & Means, P.C., Corsicana, Philip E. McCleery & Peter K. Rusek, Sheehy, Lovelace & Mayfield, P.C., Waco, for appellants.

Shannon H. Ratliff & Marc O. Knisely, McGinnis, Lochridge & Kilgore, L.L.P., Austin, Stan Harrell, Pope, Hardwicke, Christie, Harrell, Schell & Kelly, Fort Worth, for appellee.

Before THOMAS, C.J., and CUMMINGS and VANCE, JJ.

## OPINION ON REMAND

THOMAS, Chief Justice.

Inverse condemnation occurs whenever property is "taken" or "damaged" for public use without adequate compensation. TEX. CONST. art. I, § 17. We originally held that the evidence conclusively established an inverse condemnation of the plaintiffs' interests in the minerals under an eighty-acre tract when Tarrant County Water Control and Improvement District Number One, the developer and operator of the Richland–Chambers Reservoir in Navarro County, partially inundated the surface of the property to create the lake. *See Haupt v. Tarrant Cty. Water Control,* 833 S.W.2d 697, 700 (Tex. App.—Waco 1992). (One should refer to our original opinion where we list the plaintiffs, their respective interests in the mineral estate, and the sequence of events material to this appeal; to reproduce those matters again here would unduly lengthen this opinion). Based on what we considered conclusive evidence that inundation had diminished

the value of the minerals by permanently restricting the most reasonable, lowest-risk, and most cost-effective means of access—*i.e.*, vertical drilling from dry land—we held that inverse condemnation had occurred even though the trial court found that the plaintiffs could access the minerals by alternative methods of conventional or directional drilling. *See id.* Because of this conclusive proof of an uncompensated damaging of the mineral estate, which under our interpretation of the constitutional proscription resulted in an inverse condemnation, we viewed the court's finding of alternative means of access as immaterial. For that reason we ruled on but did not discuss a point attacking the factual sufficiency of the evidence supporting a finding of alternative access. *See id.* at 700–01. Accordingly, we reversed and rendered judgment in favor of all of the plaintiffs, including intertwined parties who did not appeal, on the question of inverse condemnation. *See id.* at 701.

The Texas Supreme Court, however, reversed our judgment on the ground that the "accommodation" doctrine must be considered in determining whether inverse condemnation has occurred when a governmental entity that owns the surface restricts the mineral owner's surface use. *See Tarrant County Water Control v. Haupt*, 854 S.W.2d 909, 910 (Tex.1993). First espoused in *Getty Oil Company v. Jones*, 470 S.W.2d 618 (Tex. 1971), the doctrine went unmentioned by the parties both in the trial court and this court. Although the trial court found that the plaintiffs had alternative methods of accessing the minerals, it did not find that the alternatives provided *reasonable access*. Finding "some evidence"—*i.e.*, legally sufficient evidence—of "reasonableness" in the record, the Supreme Court deemed a finding in support of the trial court's judgment that the alternative means of access were reasonable. *See Haupt*, 854 S.W.2d at 913. However, it remanded the cause for us to reconsider whether the evidence, when viewed in the light of the accommodation doctrine, is factually sufficient to support the trial court's finding of alternative access and the deemed finding of reasonableness. *See id.*

We will first discuss the Supreme Court's decision and opinion in the light of the doctrine of the "law of the case," the limitations on remand, and their effect on our disposition. Then we will examine the accommodation doctrine and its application under the facts presented. Finally, we will address the factual sufficiency of the evidence.

## LAW OF THE CASE AND LIMITED REMAND

The Supreme Court decided several questions of law that are now clearly binding on this court and the trial court under the doctrine of the "law of the case." *See Hudson v. Wakefield*, 711 S.W.2d 628, 630 (Tex.1986). First, it decided that the accommodation doctrine is applicable to this proceeding. *See Haupt*, 854 S.W.2d at 912. Second, the Court held that the Water District can only use the surface estate as a reservoir by flooding the surface. *See id.* We interpret this holding as conclusively deciding the question of "existing use" of the surface and establishing as a matter of law that there are no other practicable and reasonable uses of the surface estate. Finally, the Court ruled that the evidence is *legally* sufficient to deem a finding that the alternative means of access, which the trial court found to exist, provide reasonable access to the mineral estate. *See id.* at 913. Accordingly, we and the trial court are bound to apply this "law of the case" in all subsequent proceedings. *See Hudson*, 711 S.W.2d at 630.

Moreover, the Supreme Court expressly limited our evidentiary review on remand: "[W]e remand this case to the court of appeals for reconsideration of the factual sufficiency of the evidence to support the trial court's finding of access and the deemed finding of reasonableness in light of the accommodation doctrine." *See Haupt*, 854 S.W.2d at 913. Because of the limiting instructions in the remand, we are restricted solely to determining the factual sufficiency point. *See Hudson*, 711 S.W.2d at 630. Thus, we cannot now rule on points that were not reached in our original opinion. Finally, because we are limited to reconsidering the factual sufficiency of the evidence, a point we will later sustain, we cannot render judgment

for the plaintiffs but only remand the cause for further proceedings.

With these limitations in mind, we now turn to the accommodation doctrine and its application to this inverse condemnation proceeding.

## ACCOMMODATION DOCTRINE

■ Ownership of the mineral estate impliedly includes the right to reasonable use of the surface estate to produce the minerals. *Haupt,* 854 S.W.2d at 911. Although owning the dominant estate, the mineral owner must nevertheless exercise the right to use the surface with "due regard" for the surface owner's rights. *Id.* When faced with competing surface use by a mineral owner (lessee) and a surface owner, the Supreme Court in 1971 balanced the correlative rights of the parties:

> [W]here there is an existing use by the surface owner which would otherwise be precluded or impaired, and where under the established practices in the industry there are alternatives available to the [mineral owner] whereby the minerals can be recovered, the rules of reasonable usage of the surface may require the adoption of an alternative by the [mineral owner].

*Getty Oil,* 470 S.W.2d at 622. This principle has become known as the "accommodation" or "alternative means" doctrine.

However, the accommodation doctrine preserves—absolute and unfettered—the right of the dominant mineral estate to use the surface under certain limited circumstances:

> *Getty recognizes that if there is but one means of surface use by which to produce the minerals, then the mineral owner has the right to pursue that use, regardless of surface damage.* [citation omitted]. On the other hand, if the mineral owner has reasonable alternative uses of the surface, one of which permits the surface owner to continue to use the surface in the manner intended (especially when there is only one reasonable manner in which the surface may be used) and one of which would preclude that use by the surface owner, the mineral owner *must* use the alternative that allows continued use of the surface by the surface owner.

*Haupt,* 854 S.W.2d at 911–12 (emphasis added in the first sentence only).

■ As for the burden of proof, the mineral owner need not negate the doctrine's application. Instead, the surface owner must show that the particular manner of surface use being challenged is not reasonably necessary to the mineral owner under all circumstances. *Haupt,* 854 S.W.2d at 911; *Getty Oil,* 470 S.W.2d at 623. This may be done by proving that the mineral owner has available other reasonable means of production, in addition to the method under attack, that will not interfere with the surface owner's existing use. *Id.* Moreover, the surface owner must also show that any alternative uses of the surface, other than the existing use, are impracticable and unreasonable under all the circumstances. *Getty Oil,* 470 S.W.2d at 623. All of these elements of the surface owner's burden are fact-sensitive and must be established either conclusively or by appropriate findings in determining the reasonable necessity of the mineral owner's surface use. *Haupt,* 854 S.W.2d at 911; *Getty Oil,* 470 S.W.2d at 623.

Thus, the Water District had the burden of introducing evidence and obtaining findings necessary to establish that the plaintiffs had *alternative means* of access and that their use of the surface was not *reasonably* necessary because an *alternative* means of access was *reasonable.* Any failure of proof falls on the Water District, not the plaintiffs.

## ACCOMMODATION DOCTRINE AND ITS EFFECT ON INVERSE CONDEMNATION

■ Until *Haupt,* the accommodation doctrine had never been applied to governmental surface owners in the context of an inverse condemnation proceeding. Prior to the doctrine's formulation, inverse condemnation occurred whenever a governmental entity that had acquired the surface but not the minerals subsequently interfered, without condemnation proceedings, with the mineral owner's reasonable use of the surface. *Haupt,* 854 S.W.2d at 912 (citing *Chambers–Liberty Counties Navigation Dist. v. Banta,* 453 S.W.2d 134, 137 (Tex.1970)). The pivotal

question was whether the mineral owner still possessed the common-law right to the reasonable use of the surface. *Id.* Now, however, the accommodation doctrine must be considered in determining whether governmental interference with surface use has resulted in an inverse condemnation of the mineral estate. *Haupt,* 854 S.W.2d at 910.

The Supreme Court outlined in *Haupt* the doctrine's potential effect under the facts in this case:

> The evidence may indicate that surface drilling is the only manner of use of the surface whereby the minerals can *reasonably* be produced. In that event, the [plaintiffs have] the right to pursue this use under the accommodation doctrine. *Getty,* 470 S.W.2d at 622. If the Water District by its use of the surface has prevented this one manner of surface use by the [plaintiffs] in order to protect the fresh water supply, then inverse condemnation of the mineral estates has occurred, even under the accommodation doctrine. *See Getty,* 470 S.W.2d at 623; *Chambers–Liberty,* 453 S.W.2d at 137.

*See Haupt,* 854 S.W.2d at 913.

## IMPACT OF ECONOMICS ON REASONABLENESS

 Assessing the reasonableness of a particular means of production, especially in the context of an inverse condemnation proceeding, must include its impact on the value of the mineral estate. Economic impact is important because property is "damaged" within the constitutional proscription whenever its value is diminished because of public use. TEX. CONST. art. I, § 17; *City of Waco v. Texland Corporation,* 446 S.W.2d 1, 2 (Tex.1969). If, as here, a mineral owner has available several means of accessing the minerals, one of which will maximize the value of the mineral estate and other alternatives that, if used, will either totally destroy or reduce its value by three-fourths, one cannot logically or rationally argue that the alternative methods provide *reasonable* access to the minerals.

In our original opinion we summarized the evidence relating to the economic impact on the mineral estate from the plaintiffs being permanently deprived of using the surface to access the minerals by vertical drilling from dry land:

> James Breithaupt testified that inundating the surface had destroyed access to the minerals under the eighty acres, thus totally destroying their value, which he estimated at $3 million before inundation. Tim Taylor, a reservoir engineer, estimated the minerals' value at $1,802[,]166 before inundation and zero afterwards. A consulting petroleum engineer, Edward Ziegler, said that inundation had diminished the value of the mineral estate from $1.6 million to zero because no marine oil-field equipment is available on the lake and because directional drilling costs are prohibitive. Ziegler's opinion was that the minerals could be tapped economically only through a vertical well drilled on dry land.

> Moreover, Robert Ungerecht testified that inundating the surface had reduced the market value of recoverable reserves from $3.75 million to $937,500. This resulted, he said, from the loss of access by vertical drilling on dry land and because of the increased drilling and operating costs and increased risk associated with directional drilling. C.L. Brown, an experienced producer and operator of oil and gas interests, estimated the market value of recoverable reserves at $1.2 to $1.6 million before inundation and "close to zero" afterwards. Brown was the Water District's own expert.

> Three other experts, Dan Duffy, Jack Summitt, and Forrest Garb, expressed opinions on the value of the plaintiffs' interests on the date of inundation. They did not express opinions on the value of the minerals before and after inundation.

*See Haupt v. Tarrant Cty. Water Control,* 833 S.W.2d at 699–700. We believe this recitation fairly summarizes the relevant evidence.

Haupt, Inc., one of the plaintiffs, and La Pesca Oil drilled and completed a producing well (Fullwood No. 9) from a platform erected on dry land adjacent to the eighty-acre tract, but that was prior to the drill site's inundation in May 1989. James Breithaupt, another plaintiff, considers Fullwood No. 9 to

be an economically viable well. However, the evidence is undisputed that the plaintiffs never attempted to drill a new well or re-enter the plugged wells located on the eighty-acre tract from a platform before inundation. Bar J B Company, one of the plaintiffs, attempted to re-enter one of the plugged wells prior to inundation by vertical drilling from dry land—*i.e.*, not from a platform—but was enjoined by the Water District to protect the lake from pollution. After inundation occurred in May 1989, Haupt, Inc. attempted unsuccessfully to drill a directional well from the shore of the eighty acres.

## FACTUAL SUFFICIENCY

■ Considering all of the evidence, as we must in a factual-sufficiency review, the evidence is factually sufficient to support the trial court's finding that the plaintiffs have *alternative means* of accessing the minerals. *See Lofton v. Texas Brine Corp.,* 720 S.W.2d 804, 805 (Tex.1986). Certainly, directional drilling and platform drilling over water are generally accepted methods of production in the oil and gas industry. That does not mean, however, that those alternative methods provide the plaintiffs *reasonable* access to the minerals.

After considering the entire record, we hold the evidence is factually insufficient to support a finding, which has been deemed by the Supreme Court on the basis of the evidence's legal sufficiency, that the alternative means of production provide *reasonable access* to the mineral estate. The paucity of evidence that would support a finding of reasonableness is so weak as to make such a finding clearly wrong and manifestly unjust. *See Cain v. Bain,* 709 S.W.2d 175, 176 (Tex. 1986). Although the record contains some mention of directional, platform, or marine drilling, the Water District failed to produce any evidence that these alternative methods, although recognized in the industry, provided the plaintiffs *reasonable* access to the mineral estate. In fact, evidence from expert witnesses, including the Water District's, almost conclusively establishes the contrary, so much so that any finding of reasonableness would be clearly wrong and manifestly unjust. *See id.*

Haupt, Inc. drilled a directional well but was unsuccessful. What little evidence the record does contain relating to the economics of accessing the minerals by slant-hole drilling is that the drilling and operating costs and increased risk associated with that method of production makes it unreasonable, especially when compared to drilling a vertical well on dry land. As far as marine drilling is concerned, the only evidence produced shows that it is unreasonable because marine oilfield equipment is not available on the lake. Nor does the record contain any evidence that the plaintiffs can reasonably access the minerals *after inundation* by a platform erected over water. Fullwood No. 9 was drilled and completed from a platform erected on dry land *prior to inundation* of its drilling site.

The record clearly shows that accessing the minerals by a vertical well drilled from dry land is the only reasonable means of production because it preserves the market value of the plaintiffs' mineral interests. Even the most charitable view of the experts' testimony indicates that any other method of production will either destroy or substantially diminish the value of the mineral estate. Whatever evidence exists of reasonableness of alternative means of access is so weak that such an affirmative finding would be clearly wrong and manifestly unjust. *See id.*

## DISPOSITION

Accordingly, we sustain point five and, for the reasons stated in our original opinion, reverse the entire judgment as to all parties, including those who did not appeal. We vacate the permanent injunction against Bar J B Company, but the temporary injunction shall remain in effect until further order of the trial court. Finally, we remand all of the causes for a new trial.