IN THE

TENTH COURT OF APPEALS




 
 
 
 
 
 
 


 



No. 10-06-00252-CV

 

Valence Operating Company,

                                                                                    Appellant

 v.

 

Texas Genco, LP,

                                                                                    Appellee

 

 

 



From the 77th District Court

Freestone County, Texas

Trial Court No. 04-332-A

 



O p i n i o n



 








            In this accommodation doctrine case, Appellee
Texas Genco, LP sought a permanent injunction to prevent Appellant Valence
Operating Co. from drilling Well No. 9 of its Holmes “A” Gas Unit[1]
within cells 8 and 12 of Texas Genco’s ash-disposal landfill.  Valence, which has mineral rights in the Holmes Unit, obtained a permit from the Railroad
Commission to drill Well 9 as a 297-foot directional well (referred to by the
parties and in this opinion as the 300-foot directional well).  The trial court
entered a temporary injunction, and Valence counterclaimed for damages for
wrongful temporary injunction and for declaratory relief that it could also
drill Well 9 as a straight-hole well.  A jury found for Texas Genco on all
issues, and the trial court issued a permanent injunction and ordered that Valence take nothing on its counterclaim.

            Valence appeals, complaining in five issues
about the jury charge and the sufficiency of the evidence.  We will affirm.

Background

 

             These parties were recently before us
in what they call the “Well 8” case.  See Texas Genco, LP v. Valence
Operating Co., 187 S.W.3d 118 (Tex. App.—Waco 2006, pet. denied).  Because
the landfill’s background facts are essentially identical, we borrow them from
the Well 8 case:

            Genco's Limestone Plant began
operations in 1985 and is projected to continue operating for twenty or thirty
more years.  To produce electricity, the plant burns lignite coal from an
adjacent mine near Jewett and coal from the Wyoming Powder River Basin.  The coal burning process produces coal combustion products—such as fly ash and
bottom ash—that require Genco to have a Class II industrial landfill to dispose
of this waste.

 

            In 1985, Genco deed-recorded
approximately 450 acres[[2]]
of land for its landfill, which is regulated by the Texas Commission on Environmental
Quality (TCEQ).  It redesigned the landfill in 1994 to include an approximately
91-acre tract containing the location at which Valence wants to straight-hole
drill its Holmes Unit No. 8 well.  Genco deed-recorded this 91-acre tract as
part of its industrial landfill and registered the landfill expansion with
TCEQ.[[3]]

 

            The coal combustion products are
disposed of in the landfill in predetermined areas called cells.  Each cell has
a three-foot clay liner to control rainwater and prevent water table contamination. 
The waste ash is placed on top of the clay to the allowable landfill plan
height, and then the waste is covered by a three-foot clay layer.  While the
cell is open (waste is being actively deposited there), the cell is surrounded
by a drainage ditch that controls and directs runoff water to a settling pond. 
Once a cell reaches the permitted height and grade, topsoil and grass are
placed on top of the cell's clay cover, and the cell is considered closed. 
Genco cannot deposit waste over its entire landfill at one time because the
TCEQ allows only a certain number of acres to be open at one time.  TCEQ also
regulates the height and grade of the landfill.  Generally, the larger the
overall area of the landfill's footprint, the higher the landfill can be built.

 

Id. at 120-21.

 

            When the landfill began operations in
1985, there was one preexisting gas well (the Holmes A-1 Well, drilled by Valence’s predecessor in 1979) within the landfill’s footprint, i.e., the area used
and to be used for ash disposal.  The landfill’s initial cell sequencing order
was designed to avoid the A-1 Well, and Texas Genco (then known as Houston
Lighting & Power) expected that it would be depleted and plugged by the
time the cell progression reached it.  Texas Genco thus began filling its
landfill counter-clockwise away from the A-1 Well.  Over the next thirteen
years, Texas Genco filled and closed cells 1 through 5 with no additional gas
drilling activity in the landfill area.[4]

            In 1998, while Texas Genco was working
on cell 6 and preparing to move to cell 9, Valence drilled two wells (the Reed
E-4 and Reed E-5) just inside the landfill’s border.  At that time, Texas Genco
was willing and able to “notch around” those wells because they were located at
the landfill’s very edge and Texas Genco believed it had viable landfill
options in other directions.  Another five years then passed with no gas
drilling activity in the landfill area, and the landfill progressed through
cells 9 and 10.  In 2003, Valence drilled Well 3, which Texas Genco was again
able to notch around because it was at the landfill’s outer edge.  Valence then drilled Wells 4, 5, and 7, which removed Texas Genco’s option to expand the
landfill to the east, northeast, and north.  Because Texas Genco’s landfill was
in effect surrounded by wells, which eliminated all possible options for
expansion of the landfill, Texas Genco objected to Valence’s proposals to drill
Wells 8 and 9 within the landfill’s footprint and attempted to persuade Valence to directionally drill the wells.

            The Well 8 and Well 9 lawsuits
followed.  In the Well 8 case, we held that the evidence was sufficient to
support favorable jury findings for Texas Genco on its accommodation doctrine
claim with respect to cell 20 of the landfill.  Based largely on our Well 8
opinion, in the present case the trial court submitted the following jury
questions:

QUESTION NO. 1

 

Do you find that
Texas Genco has no other practicable
and reasonable use of the surface at
the proposed Well No. 9 Surface
Location other than as a landfill?

 

Answer “Yes” or “No”        ______________

 

 

QUESTION NO. 2

 

Is Valence’s proposed
drilling at the Well No. 9 Surface
Location not reasonably necessary?

 

 

Instructions

 

You are instructed that Valence s proposed use of
the surface at the Well No. 9 Surface Location is not reasonably necessary if:

 

(1)        Texas Genco
has an existing use of the surface at the proposed Well No. 9 Surface Location that would be precluded or substantially impaired if Valence drills Well No. 9 at that location, and

 

(2)        directional drilling is an industry-established
practice that provides Valence reasonable access to its minerals.

 

Answer “Yes” or
“No”        ______________

 

The jury answered “yes” to both questions.  Valence does not complain about Question No. 1 in this appeal.  Thus, we focus on the
issues that address Question No. 2, as well as issues of law.

Issues on Appeal

            Valence raises five issues:


 Does the accommodation doctrine give Texas
 Genco the power to force Valence to drill Holmes Unit Well No. 9 from a location
 outside the boundaries of its lease and the Holmes unit?


 


 Is the accommodation doctrine so broad that
 Texas Genco can force Valence to drill a Holmes Unit well through the Reed
 E Unit, in the absence of legally and factually insufficient evidence that
 Valence would not become liable to others by doing so?


 


 Was there legally and factually sufficient
 evidence of substantial impairment of Texas Genco’s existing use of
 the surface when Texas Genco relied on a “modified landfill footprint,”
 created after it sued for an injunction, to prove that element of its
 claim?


 


 Did the trial court err in submitting a
 single broad-form question on the accommodation doctrine, inquiring about
 multiple proposed surface locations, when the evidence with respect to the
 two proposed surface locations at issue was so different that a reasonable
 jury could have answered “yes” as to one location and “no” as to the
 other?


 


 Did the trial court err in instructing the
 jury that it was not reasonably necessary for Valence to use its proposed
 surface locations if directional drilling was “an industry-established
 practice that provides Valence reasonable access to its minerals” when a
 reasonable jury could have concluded that Valence’s proposed 300-foot
 directional well located on the Holmes unit met that definition, but that
 Texas Genco’s proposed 1000-foot directional well through the Reed E unit
 did not?


 

The Accommodation Doctrine

            In the Well 8 case, we set forth the
contours of the accommodation doctrine:

            The dominant mineral estate has the right to reasonable use of the
surface estate to produce minerals, but this right is to be exercised with due
regard for the rights of the surface estate’s owner.  Getty Oil Co. v.
Jones, 470 S.W.2d 618, 621 (Tex. 1971).  This concept of “due regard,”
known as the accommodation doctrine, was first articulated in Getty Oil
and balances the rights of the surface owner and the mineral owner in the use
of the surface.  Tarrant County Water Control & Improvement Dist. No. 1
v. Haupt, Inc., 854 S.W.2d 909, 911 (Tex. 1993) (Haupt I).  Upon
remand of Haupt I, we reiterated the elements of the accommodation
doctrine that have been established by the supreme court:

 

[W]here there is an existing use by the surface
owner which would otherwise be precluded or impaired, and where under the
established practices in the industry there are alternatives available to the
[mineral owner] whereby the minerals can be recovered, the rules of reasonable
usage of the surface may require the adoption of an alternative by the [mineral
owner].

 

Haupt, Inc. v. Tarrant County Water Control &
Improvement Dist. No. 1, 870
S.W.2d 350, 353 (Tex. App.—Waco 1994, no writ) (Haupt II) (quoting Getty
Oil, 470 S.W.2d at 622).  And while we noted that the accommodation
doctrine preserves the mineral owner’s absolute right to use the surface if
there is only one way to produce the minerals, we repeated the core of the
accommodation doctrine:

 

Getty recognizes that if there is but one means of
surface use by which to produce the minerals, then the mineral owner has the
right to pursue that use, regardless of surface damage.  [citation omitted].  On the other hand, if the
mineral owner has reasonable alternative uses of the surface, one of which
permits the surface owner to continue to use the surface in the manner intended
(especially when there is only one reasonable manner in which the surface may
be used) and one of which would preclude that use by the surface owner, the
mineral owner must use the alternative that allows continued use of the
surface by the surface owner.

 

Id.
(quoting Haupt I, 854 S.W.2d at 911-12) (emphasis in original); see
also id. at 912-13 (“if reasonable alternative drilling methods
exist that protect [the surface owner’s existing use], then an accommodation by
the mineral owners would be required”) (emphasis added).  We then
delineated the surface owner’s burden of proof:

 

[T]he surface owner must show that the particular
manner of surface use being challenged is not reasonably necessary to the
mineral owner under all circumstances.  Haupt, 854 S.W.2d at 911; Getty
Oil, 470 S.W.2d at 623.  This may be done by proving that the mineral owner
has available other reasonable means of production, in addition to the method
under attack, that will not interfere with the surface owner’s existing use.  Id.  Moreover, the surface owner must also show that any alternative uses of the
surface, other than the existing use, are impracticable and unreasonable under
all the circumstances.  Getty Oil, 470 S.W.2d at 623.  All of these elements
of the surface owner’s burden are fact-sensitive and must be established either
conclusively or by appropriate findings in determining the reasonable necessity
of the mineral owner’s surface use.  Haupt, 854 S.W.2d at 911; Getty
Oil, 470 S.W.2d at 623.

 

       Thus, the Water District [the surface
owner] had the burden of introducing evidence and obtaining findings necessary
to establish that the plaintiffs [the mineral owners] had alternative means of
access and that their use of the surface was not reasonably necessary because
an alternative means of access was reasonable.

 

Haupt II, 870 S.W.2d at 353.

 

Texas Genco, 187 S.W.3d at 121-23 (footnote omitted) (italics in original).

Accommodation Off the Premises?

            Valence’s first two issues concern its
claim that Texas Genco is forcing Valence to drill from a location outside the surface
of the Holmes Unit and that the trial court erred in rendering a judgment that,
in effect, allows Texas Genco to force Valence to drill Well 9 off of the
Holmes Unit surface.  Among other Well 9 locations suggested by Texas Genco was
a location next to Well 5 of the adjacent Reed E Unit (also located on Texas
Genco’s surface), as Texas Genco had obtained written consent for the drilling
of Well 9 from XTO Energy, the Reed E Unit operator, in part for Valence’s
convenience because it could co-locate the Well 9 pad with an existing well pad.[5] 
 Valence asserts that, because Texas Genco did not prove with legally and
factually sufficient evidence that Valence can accommodate Texas Genco’s
surface use on the Holmes Unit, Texas Genco is not entitled to an
accommodation.[6]

            We acknowledge Valence’s complaint
about the questionable extension of the accommodation doctrine that would
require the mineral owner to use an off-unit (also referred to herein as
off-lease) surface location,[7] but
we ultimately need not reach that issue because Texas Genco presented legally
and factually sufficient evidence of several on-unit locations outside of the
landfill’s ash disposal area that the jury could have found to provide Valence reasonable access to its minerals by directional drilling.[8]

            Texas Genco points out that its aim is
not to force Valence to drill outside the Holmes Unit’s boundary but to have Valence drill outside of the landfill area available for ash disposal, i.e., the
landfill’s “footprint.”  Texas Genco’s brief cites to its witnesses’ testimony
that “they will gladly work with Valence to allow it to drill wells anywhere
outside the ash disposal area of its landfill, without regard for the deed-recorded
boundary. . . .  [T]he only criteria for an acceptable location was that it be
located outside the landfill’s ash disposal area.”  (Appellee’s Brief at 34,
41).  We construe Texas Genco’s position to be that there are one or more
on-unit locations inside the landfill’s deed-recorded acreage, but outside the
actual ash disposal area, for which Texas Genco will not oppose Valence’s directional drilling of Well 9.[9]

Texas Genco’s experts and its plant manager all
testified to acceptable on-unit locations, and Valence did not challenge at
least two on-unit locations.[10] 
The experts opined that the ability to directionally drill Well 9 approximately
1,000 to 1,150 feet from its “bottom-hole” location is industry-established and
technically and economically feasible.  Because there is legally and factually
sufficient evidence of on-unit locations outside of the actual ash disposal
area, we overrule Valence’s first two issues.

Existing Use

            Issue three complains of the legal and
factual sufficiency of the evidence that Valence’s permitted location for Well
9 (the 300-foot location) would substantially impair Texas Genco’s existing use
of its landfill.  Rather than challenging the evidence on Texas Genco’s
existing use of cells 8 and 12, Valence focuses its complaint on a statement in
Texas Genco’s pleading that the “9A Alt.” 772-foot location (which Texas Genco
had offered as part of a package deal to resolve Wells 6, 8, and 9 but was never
accepted by Valence) was “at the boundary of the Disposal Site” and “off the
landfill.”  Valence then interjects that, after Texas Genco withdrew its 9A
Alt. location, between the time it filed suit and the trial, Texas Genco
created a modified landfill footprint that expanded the available disposal area
to the east.  Valence asserts that the modified footprint was done so that both
the 9A Alt. location and the permitted 300-foot location would appear on paper
to be further within the landfill’s footprint, rather than “at the
boundary of the Disposal Site” and “off the landfill.”  Thus, Valence
concludes, the 300-foot location—a “stone’s throw” from Texas Genco’s 9A Alt.
location—could not substantially impair Texas Genco’s existing use, by Texas
Genco’s own admission.

            We first note that Texas Genco
presented legally and factually sufficient evidence of substantial impairment
of its existing use of the landfill with respect to cells 8 and 12 and the
300-foot location.  Cells 8 and 12 are within the landfill’s footprint.  While
ash has not been deposited in them yet, disposal in cell 7 was near completion,
about half of cell 8 had been prepared with a clay liner for depositing ash,
and topsoil and clay had been mined from cell 12 for use in other cells.  Texas
Genco presented testimony that drilling at the 300-foot location would change
the geometry of the landfill, would require ash removal from cell 4, and likely
require ash removal from cell 10.  These changes would cut 2.2 years (about
20%) of the estimated 11-year remaining life of the landfill.  This evidence is
sufficient.  See Texas Genco, 187 S.W.3d at 124.

            As for the modified landfill
footprint, Texas Genco’s plant manager explained that, as a result of the
landfill’s being surrounded by gas wells and learning of Valence’s proposal for
still more wells, Texas Genco modified its plan for ash disposal to maximize
“every available square inch” of space on the landfill’s eastern side.  The
jury was free to believe this explanation over Valence’s allegation that Texas
Genco modified the footprint just to improve its litigation position.  And
finally, if we were to assume that the 772-foot 9A Alt. location is at the
“boundary of the Disposal Site,” we agree with Texas Genco that it does not
follow that Texas Genco does not have an existing use that would be
substantially impaired by Valence’s directional drilling at the permitted 300-foot
location, which is not a “stone’s throw” from the 772-foot 9A Alt.
location.  The jury was free to reject that argument as well.  We overrule Valence’s third issue.

Charge Issues

 

            In the Well 8 case, we noted that the
trial court should have submitted a broad-form charge.  See Texas Genco, 187 S.W.3d at 123 n.2.  The trial court did so in this case.

            In issues four and five, Valence complains about the definitions and instructions accompanying Question No. 2.  The
charge defined “Well No. 9 Surface Location” as “the sites within Cells 8
and/or 12 in Texas Genco’s Landfill in which Valence proposes drilling Well No.
9.”  Issue four complains that the trial court erred in defining “Well No. 9 Surface
Location” to include both Valence’s straight-hole location and the 300-foot
permitted location and that the trial court erred in rejecting Valence’s proposed separate questions for each location.  We review a trial court’s rulings
on questions, instructions, and definitions to be included in a jury charge
under an abuse-of-discretion standard.  Gilmore v. Sci Tex. Funeral Servs.,
Inc., 234 S.W.3d 251, 261 (Tex. App.—Waco 2007, pet. denied).

            Valence asserts that the trial court
erred in failing to ask separate questions and in its definition of “Well No. 9
Surface Location” because the evidence about those two locations differed and
such error was harmful because:  (1) the “jury could have reasonably concluded
that Texas Genco had an existing use at the straight-hole location, but not at
the permitted [300-foot] location where Valence was willing to directionally
drill” (which, as we noted above, Valence charged was “at the boundary of the
Disposal Site,” by Texas Genco’s own admission); and (2) “the jury could have
concluded from this evidence that Texas Genco’s use of the surface would be
precluded or substantially impaired at the straight-hole location, but not at
the permitted location.”  Thus, Valence concludes, under the definition given,
“the jury’s answer would be the same no matter which of these conclusions it
reached.”

            Texas Genco’s “breach of accommodation
doctrine” claim sought as a remedy an injunction prohibiting Valence from
drilling Well 9 within the disposal site and pled that its use of the disposal
site was preexisting and would be impaired by Valence’s drilling Well 9 within
the disposal site.  Valence counterclaimed, seeking a declaratory judgment that
it was not required to accommodate the straight-hole and 300-foot locations. 
On issue four, Texas Genco responds that it was not error to submit Texas
Genco’s broader accommodation doctrine claim, rather than Valence’s narrower
two-location counterclaim for declaratory judgment that was subsumed within
Texas Genco’s broader claim.  We agree.

Valence’s
counterclaim—which essentially was a denial of Texas Genco’s claim—was subsumed
within the broader relief that Texas Genco sought.  Cf. National Enter.,
Inc. v. E.N.E. Props., 167 S.W.3d 39, 43-44 (Tex. App.—Waco 2005, no
pet.).  The trial court’s broad-form submission about cells 8 and 12 put both
Texas Genco’s broader claim for relief and Valence’s narrower claim squarely
before the jury.  Thus, the trial court did not abuse its discretion in
refusing to submit separately Valence’s narrow counterclaim.

We also agree with Texas Genco that harm could not
result to Valence if the jury concluded that Texas Genco had an existing use at
one location (i.e., the straight-hole location) but not at the other
location, or that Texas Genco’s use of the surface would be substantially
impaired at one location, but not at the other.  Under the definition given,
the jury’s answer would be the same no matter which of the conclusions it
reached, but either conclusion would have compelled a “no” answer to Question
No. 2 and would have inured to Valence’s benefit.  As Question No. 2 was
submitted, Texas Genco had to prove existing use and substantial impairment at
all proposed drilling sites within cells 8 and 12 to obtain a favorable jury
finding.[11] 
Moreover, submitting separately the two specific locations—rather than all of
cells 8 and 12 broadly—could have led to further litigation over cells 8 and 12
because Valence could have sought to drill elsewhere within those cells if it
did not prevail on only the two specific locations.  We overrule issue four.

Issue five complains that Question No. 2 is
erroneous because it fails to inquire about the reasonableness of the
alternative access to the minerals in that its second instruction on
directional drilling is not fact-specific.  Valence posits that “the jury could
have thought that a 300-foot directional well was reasonable, but that a
1000-foot directional well was not.”  Thus, Valence concludes, “the jury was
instructed to answer the broad-form question if any kind of directional
drilling was an industry-established practice providing reasonable access to
the minerals.”

We do not accept Valence’s isolation of the second
instruction.  Instead, it must be read in the context of all of Question No. 2
and the evidence.  “Well No. 9 Surface Location” was defined in the charge as
“the sites within Cells 8 and/or 12 in Texas Genco’s Landfill in which Valence proposes drilling Well No. 9.”  Texas Genco aptly responds that, because the
300-foot location is indisputably within cells 8 and 12 and the 1000-foot
location is not, by finding that Valence’s drilling at the Well 9 surface
location “is not reasonably necessary,” the jury could not logically have
believed that directional drilling from the 300-foot location (or any other
location within cells 8 or 12) provides Valence reasonable access to its
minerals, but that drilling from somewhere outside cells 8 or 12 would not
provide reasonable access.  In other words, for the jury to find that drilling
within cells 8 or 12 is not reasonably necessary, they jury had to conclude
that directional drilling from somewhere outside cells 8 and 12—including the
1000-foot location—provides Valence reasonable access.

Valence also
contends that the jury could have thought that a directional well on the Holmes
Unit was reasonable while a directional well from another unit was not.  But as
we noted above, there was evidence of on-unit locations outside of cells 8 and
12, and the jury was entitled to base its answer to Question No. 2 on that
evidence.  Again, we note that Valence does not complain on appeal of the
improper admission of evidence about the off-unit locations.  Thus, we disagree
that there could have been a commingling of valid and invalid theories, which
in any event was not the subject of a specific objection to the charge in the
trial court.  For the above reasons, we overrule issue five.

 

Conclusion

            Having overruled all of Valence’s issues, we affirm the trial court’s final judgment and permanent injunction.

 

BILL VANCE

Justice

 

Before
Justice Vance, 

            Justice
Reyna, and

            Judge
Anderson[12]

Affirmed

Opinion
delivered and filed February 27, 2008

[CV06]

 









[1]               The Holmes Unit is a 679.65-acre
pooled unit that includes Valence’s mineral interests.





[2]               This area includes a 392-acre tract
and a 55-acre tract that has never been used for landfill operations.

 





[3]               In 1997, Texas Genco deed-recorded
and registered another 99 acres adjacent to the 91-acre tract.





[4]               In 1979, Railroad Commission rules
allowed only one well per 640 acres.  By 2000, the limit was one well per forty
acres, under which sixteen or seventeen wells could be drilled on the Holmes
Unit.





[5]               XTO and Valence own over 95% of the
working interest in the Reed E Unit, and XTO agreed to waive any subsurface
trespass claims against Valence. 

 





[6]               In reviewing the
legal sufficiency of the evidence, we view the evidence in the light most
favorable to the verdict, crediting favorable evidence if reasonable jurors
could, and disregarding contrary evidence unless reasonable jurors could not.  City of Keller v. Wilson, 168 S.W.3d
802, 807, 822 (Tex. 2005).  There is legally insufficient evidence or “no
evidence” of a vital fact when (a) there is a complete absence of evidence of a
vital fact; (b) the court is barred by rules of law or of evidence from giving
weight to the only evidence offered to prove a vital fact; (c) the evidence
offered to prove a vital fact is no more than a mere scintilla; or (d) the
evidence conclusively establishes the opposite of the vital fact.  Merrell Dow Pharms., Inc. v. Havner,
953 S.W.2d 706, 711 (Tex. 1997).  In reviewing the factual sufficiency of the
evidence, we must consider and weigh all of the evidence, not just the evidence
that supports the verdict.  Maritime Overseas Corp. v. Ellis, 971 S.W.2d
402, 406-07 (Tex. 1998); Checker Bag Co. v. Washington, 27 S.W.3d 625,
633 (Tex. App.—Waco 2000, pet. denied).  We will set aside the finding only if
it is so contrary to the overwhelming weight of the evidence that the finding
is clearly wrong and unjust.  Ellis, 971 S.W.2d at 407.

 





[7]               See Sun Oil Co. v. Whitaker,
483 S.W.2d 808, 812 (Tex. 1972) (stating that accommodation doctrine
articulated in Getty Oil is “limited to situations in which there are
reasonable alternative methods that may be employed by the lessee on the
leased premises to accomplish the purposes of the lease.”) (emphasis
added); Owen L. Anderson, Geophysical “Trespass” Revisited, 5 Tex. Wesleyan L. Rev. 137, 182 &
n.200 (1999) (“Under the Texas accommodation doctrine, for an alternative to be
reasonable, it must be available on the land in question.”) (emphasis
added).  Sun Oil is distinguishable, however, because it did not involve
conflicting uses of the surface between the surface owner and mineral owner;
rather, it involved whether the mineral owner was entitled to freely use
subsurface water owned by the surface owner or whether it should be required to
purchase water from someone other than the surface owner.  Sun Oil, 483
S.W.2d at 812.

 





[8]               Also, because Valence does not
challenge on appeal the trial court’s admission of evidence relating to the
off-unit locations, that evidence was properly before the jury in this case.

 





[9]               Whether Texas Genco’s position
necessitates a modification of the judgment is an issue that can be raised in a
motion for rehearing, as the judgment enjoins Valence from drilling “Well 9 at
any location within (i) Cells 8 and/or 12 of [Texas Genco’s landfill] …, but
only to the extent any such location is also included within (ii) the
boundaries of the 392.258-acre and 91.217-acre deed recorded tracts. . . .”  

 





[10]             We thus need not address the parties’
arguments on subsurface trespass if Valence were to directionally drill from
the Reed Unit.





[11]             In its reply brief, Valence complains
that harm exists because Question No. 2 improperly commingled valid and invalid
theories of liability.  See Harris County v. Smith, 96 S.W.3d
230, 233-34 (Tex. 2002); Crown Life Ins. Co. v. Casteel, 22 S.W.3d 378,
388 (Tex. 2000).  Valence, however, does not pinpoint an invalid theory of
liability, and there was evidentiary support for the jury’s finding as to all
of cells 8 and 12.  Additionally, this particular complaint is not preserved
for appeal because it was not timely and specifically made in the charge
conference.  See Casteel, 22 S.W.3d at 389 (“When a single broad-form
liability question erroneously commingles valid and invalid liability theories and
the appellant’s objection is timely and specific, the error is harmful when
it cannot be determined whether the improperly submitted theories formed the
sole basis for the jury's finding.”) (emphasis added).





[12]             Hon. Ken Anderson, Judge of the 277th
 District Court of Williamson County, sitting by assignment of the Chief
Justice of the Texas Supreme Court.  Judge Anderson’s appointment was
necessitated by Chief Justice Gray’s recusal.