**Robert E. LANDRETH, Appellant,**

v.

**Cesareo MELENDEZ, et al., Appellees,**

**No. 07–96–0248–CV.**

Court of Appeals of Texas,
Amarillo.

June 30, 1997.

Rehearing Overruled Aug. 1, 1997.

---

Frank L. Lacy, Brownfield, for appellant.

Carr Fouts Hunt & Wolfe LLP, Charles R. Watson, Jr., Amarillo, for appellees.

Before BOYD, C.J., REAVIS, J., and REYNOLDS, Senior Justice.*

*ON MOTIONS FOR REHEARING*

REYNOLDS, Senior Justice (Retired).

Following our 30 April 1997 reversal of the trial court's judgment and remand of this cause, all parties filed motions for rehearing. The motions are overruled, but our original opinion is withdrawn and, in lieu thereof, this opinion issued to further address reiterations presented in the motions for rehearing.

Robert E. Landreth, owner and operator of an oil and gas lease covering the mineral estate that had been severed from the surface, which was owned by Cesareo Melendez and wife, Prisaliana Melendez, and farmed by Cesareo Melendez and David Melendez (collectively, Melendez), perfected this appeal to challenge a bench-trial judgment decreeing Melendez's recovery of $5,000 from him, and permanently enjoining him from interfering with Melendez's existing irrigation system. With two points of error, Landreth contends an express reservation in the Melendez's chain of title precluded the claims, and the evidence is legally and factually insufficient to support those claims. We will reverse and remand.

In 1947, J.P. and Matilda Nystel, then owners of Section 9, Block C–38, PSL Survey, Terry County, executed an oil and gas lease covering the section, which has remained in force by continuing production of oil. Three years later, in 1950, the Nystels conveyed the surface of the section, specifying that:

> There is excepted from this conveyance, and not conveyed hereby, all oil, gas and other minerals in, on and under the hereinbefore described land, and there is expressly reserved to and for the owners of the oil, gas and other minerals in, on and under the hereinbefore described land the right of ingress and egress with respect to said land and any part thereof for the sole and only purpose of testing, exploring, drilling, producing, marketing, mining and operating the hereinbefore described land for oil, gas and other minerals and for the purpose of laying pipe lines, building tanks, shafts, tunnels, power stations, roads and structures thereon to produce, mine, save and take care of said oil, gas and other minerals and to take all usual, necessary and convenient means for working, preparing, getting out and removing said oil, gas and other minerals from under and away from the hereinbefore described land. It is expressly understood that

---

* Charles L. Reynolds, Chief Justice (Ret.), Seventh Court of Appeals, sitting by assignment. Tex. Gov't Code Ann. § 75.002(a)(1) (Vernon Supp. 1997).

there shall be no liability on the part of grantors herein, their heirs and assigns, to grantees herein, their heirs and assigns, for damages to the surface estate in the hereinbefore described land in connection with the testing, drilling, producing and marketing of oil, gas and other minerals from the hereinbefore described land as aforesaid.

In February 1989, Cesareo Melendez and wife, Prisaliana Melendez, purchased, "subject to any existing easements and reservations," the South one-half of Section 9 "SAVE AND EXCEPT all of the oil, gas and other minerals in, on and under and that may be produced from said lands and premises."

At the time of the Melendez purchase, two wells were situated on the southwest quarter of the land. An injection well, drilled in 1951, and a tank battery were situated on the northeast quarter of the southwest quarter, and a producing oil well, the Nystel 3–B, drilled in 1983, was situated on the southeast quarter of the southwest quarter. Production from the Nystel 3–B well was obtained by the use of a "horse head" pump jack, which extended approximately 21 feet above ground at the top of its stroke.

Melendez grew irrigated cotton on the surface of the land. The southwest quarter was irrigated with a shortened center-pivot system which did not reach to the tank battery and the Nystel 3–B well.

In July of 1993, Landreth purchased the Nystel lease from Texaco, and also purchased portions of the underlying reversionary mineral estate. Landreth advised Melendez, apparently in April of 1994, of his intention to develop the property by drilling some additional wells. In the same month, Melendez installed a quarter section electric center-pivot irrigation system, and requested Landreth to make accommodations for the system. As a result of negotiations, they agreed that Landreth would, and in May of 1994 he did, construct ramps at his expense in order that Melendez's system would pass over the Nystel 3–B well.

In September of 1995, when Landreth made Melendez aware that he planned to drill two new wells, they had discussions attempting to accommodate the operations of each. Unable to reach an accord, Landreth drilled and completed the Nystel 4–B and 5–B oil wells from November of 1995 to January of 1996. Conventional pump jacks were installed so that they were no higher than the pump jack on the Nystel 3–B well.

In February of 1996, Melendez initiated the action underlying this appeal. Pleading that Landreth had failed to reasonably accommodate them by employing methods that would permit the operation of the irrigation system, Melendez alleged that the pumping units rendered the irrigation system useless, resulting in damage to, and excessive use of, the land and damage to crops, which would continue unless Landreth was restrained. Melendez sought a temporary restraining order, a temporary injunction and, upon trial, an injunction permanently enjoining Landreth from maintaining the pumps at a point higher than that at which the irrigation system will pass, and damages. A temporary restraining order and, later, a temporary injunction were issued as Melendez prayed.

At trial, it was evinced that prior to the drilling of the two wells, Landreth and Melendez explored alternatives to the location of the wells and the use of conventional pump jacks. Directional drilling and use of low-profile pumping units were impractical to Landreth. His proposal to modify and maintain, at his expense, the irrigation system by erecting taller towers to pass over the wells was rejected by Melendez, it also being documented that the holder of the lien on the irrigation system objected to its modification.

Melendez relied on evidence that the conventional pumping units Landreth installed would not allow the irrigation system to pass over them, and raising the towers of the irrigation system would cause numerous problems. The use of conventional pumping units was an excessive use of the surface, and the units used more vertical space than low-profile units, the cost of which was not prohibitive, and which could be used to produce the minerals while allowing the irrigation system to pass over them. Although oil and gas operators preferred conventional pumping units, farmers preferred low-profile units, which usually are used when an irrigation

system is in place before the wells are drilled.

Landreth relied on evidence that the usual form of pump jacks was conventional, that it was necessary to employ the higher capacity conventional pump jacks to move the volumes of fluid underneath the surface, and that the proposed modification of the irrigation system by raising not more than three of 145 sprinkler heads would allow continued reasonable use of the surface. The low-profile pumping units, which were used on only one percent of the area wells, were unacceptable because of their expense, increased maintenance, limited pumping capacity, and safety problems posed by the accumulation of hydrogen gas in the below-ground cellars housing the pumps.

The trial court rendered judgment decreeing that Melendez recover from Landreth $5,000, and that Landreth is permanently enjoined from interfering with the present irrigation system by maintaining pump jack units or other structures which raise to a height of more than 12 inches below the lowest portion of the physical irrigation unit. Making findings of fact and conclusions of law, the court found, inter alia, that the damages were $2,500 for each well site, that Landreth's use of the pump jacks is not reasonable, and that the "accommodation doctrine" does apply to this case.

On appeal, Landreth contends, as he did in the trial court, that the unambiguous reservation in the chain of title to the land granted the mineral owner freedom from demands by the surface owners which form the basis for Melendez's damage claims and the permanent injunction imposed by the trial court. By the reservation, he asserts, there was reserved the right to build structures, such as conventional pump jacks, to produce the mineral estate, and the purchasers of the surface estate took it with the express understanding that their title excluded the right to collect damages in connection with the mineral operations. Moreover, he adds, since he used no more of the surface than reasonably necessary to produce the mineral estate, he was not required to accommodate the surface owners. Nevertheless, he opines, the trial court erroneously concluded that he had vio-

lated the common law duty, imposed in the absence of the reservation, to make reasonable efforts to accommodate the surface owners' use of the land.

Melendez responds that the rights reserved to the mineral owners were limited to usual, necessary, and convenient means of production, and the limitation necessitates the application of the accommodation doctrine, which is not inconsistent with the language of the reservation. Thus, Melendez argues, because the current irrigation system was in place before the development of the new wells, Landreth would have to accommodate the system when he developed the wells. By the judgment granting the injunction and damages, Melendez concludes that the trial court correctly preserved the rights of the surface owners to be free from unreasonable, excessive use of the surface and interference by the mineral owner.

Aside from their opposing contentions, Landreth and Melendez agree that the Nystel reservation is in their respective chains of title. They disagree on whether it is ambiguous. Landreth submits that it is clear and unambiguous; Melendez proposes that it is ambiguous because it is subject to multiple interpretations.

The interpretation and construction of the reservation contained in the Nystel deed is controlled by the intention which is expressed by the language used in the instrument. *Luckel v. White*, 819 S.W.2d 459, 461 (Tex.1991). If the reservation is phrased in language that can be given a certain or legal meaning or interpretation, it is not ambiguous, *Universal C.I.T. Credit Corp. v. Daniel*, 150 Tex. 513, 243 S.W.2d 154, 157 (1951), and the proper construction of the language in the deed is a question of law for the court. *Luckel v. White*, 819 S.W.2d at 461; *Anderson & Kerr Drilling Co. v. Bruhlmeyer*, 134 Tex. 574, 136 S.W.2d 800, 805 (1940). Absent an ambiguity, mere disagreement over the interpretation of the reservation will not make it ambiguous, *Sun Oil Co. (Delaware) v. Madeley*, 626 S.W.2d 726, 727 (Tex. 1981), for a party's construction is immaterial. *Id.* at 732.

■ The reservation is unambiguous. It is phrased in language which clearly and plainly reserves to the mineral owners the right "to take all usual, necessary and convenient means," as enumerated, to explore for, produce and remove the oil, gas and other minerals under the surface; and, the language specifies that when the exploration and production is "as aforesaid," *i.e.*, "all usual, necessary and convenient means" are used, the mineral owners are absolved from liability for damage to the surface.

■ With the reservation of record and the recitals in the deed by which Melendez acquired the surface, Melendez became bound by the operation of the reservation. *Westland Oil Development Corp. v. Gulf Oil*, 637 S.W.2d 903, 908 (Tex.1982). Thus, when Melendez took title to the surface, he was on notice of the mineral owners' right to use as much of the surface as was required in employing "all usual, necessary and convenient means" to further explore for, produce and remove the minerals, which might require additional pumping units, without being liable for damages to the surface. Then, absent any claim that Landreth was negligent in his activities, if Melendez was entitled to relief from Landreth's operations, it was because Landreth's exploration, production and removal of the minerals was by a method other than all usual, necessary and convenient means.

■ Given the rights reserved to the mineral owners by the reservation, it follows that this is not a situation where the usual rights implied from a standard lease in favor of the mineral estate are to be exercised with due regard to the rights of the surface owners to be accommodated in the existing use being made of the surface. *See, e.g., Getty Oil Co. v. Jones*, 470 S.W.2d 618, 621–22 (Tex.1971). Instead, it is a situation where the mineral owners are under no obligation to accommodate the surface owners in the existing use made of the surface so long as the mineral owners use all usual, necessary and convenient means in conducting their operations.

■ Then, to be entitled to relief, Melendez had the burden of proof, *id.* at 623, to establish that Landreth's production from the two new wells was not by "all usual, necessary and convenient means." Melendez did not discharge the burden.

As earlier noticed, Melendez's position, and the proof adduced in support of it, was that since the center-pivot irrigation system was in place before Landreth drilled the last two wells, the means employed by Landreth in utilizing the conventional pump jacks interfered with the existing use being made of the surface with the irrigation system, and Landreth was required to accommodate the existing surface use, which could be accomplished by employing low-profile pump units. However, the proof that farmers prefer low-profile pump units and that they are used in one percent of the area wells shows that, albeit preferable to farmers, low-profile pump units are "uncommon, not usual," Black's Law Dictionary 1540 (6th ed.1990), and are not usual, *i.e.*, "in common use," *id.* at 1544, in the area wells. And, with evidence of the impracticality of the low-profile pump units and the need for the conventional pump jacks to move volumes of subsurface fluids, Melendez's proof did not negate the necessity of Landreth's use of the conventional pump jacks.

In brief, Melendez failed to discharge his burden of showing that Landreth did not take "all usual, necessary and convenient means" to effect production. Indeed, in making its findings of fact, the trial court, applying the accommodation doctrine, omitted any reference to, and declined to make additional factual findings addressing, whether Landreth used all usual, necessary and convenient means to produce the minerals.

Under these circumstances, Melendez did not evince an entitlement to the relief requested. Neither did Landreth establish his first-point contention that the Nystel reservation precluded Melendez's claims. Because the trial court did not undertake to decide whether Landreth used all usual, necessary, and convenient means to produce the minerals, a judgment cannot be rendered on that issue unless it was established as a matter of law from the record. Although Landreth attempted to demonstrate that the evidence conclusively established conventional pump jacks were usual, necessary, and

convenient to his operations on the Melendez land, such evidence, considered in the light of the evidence concerning the area use of law-profile pump units in similar situations, only posed the issue for resolution. As a result, the controlling issue still awaits a decision by the trier of fact.

Accordingly, we overrule Landreth's first point of error and the legally insufficient evidence contention in his second point of error, but sustain the factually insufficient evidence contention in the second point. On remand, Melendez will have the burden to show that Landreth has not used the usual, necessary, and convenient means to produce the minerals.

The judgment is reversed and the cause is remanded.