**TEXAS GENCO, LP, Appellant,**

v.

**VALENCE OPERATING COMPANY, Appellee.**

**No. 10–04–00365–CV.**

Court of Appeals of Texas, Waco.

Jan. 18, 2006.

Special Note Jan. 25, 2006.

John Anaipakos, Baker & Botts LLP, Houston, Joe B. Cannon, Cannon & Simmons, Groesbeck, David E. Jackson, Jackson, Sjoberg, McCarthy & Wilson, Austin, for appellant.

Brian D. Melton, Susman Godrey LLP, Roger Townsend, Alexander, DuBose Jones & Townsend LLP, Houston, Bobby Reed, Reed & Reed, Groesbeck, for appellee.

Before Chief Justice GRAY, Justice VANCE, and Justice REYNA.

## OPINION

BILL VANCE, Justice.

This is an accommodation doctrine case. Appellant Texas Genco, LP (Genco), the surface owner of a tract of land in Freestone County, sued to enjoin Appellee Valence Operating Company (Valence), the mineral estate owner, from straight-hole drilling a gas well on the tract, which is part of Genco's ash-disposal landfill for its nearby electrical power generation plant (the Limestone Plant). The trial court entered a temporary injunction that prevented straight-hole drilling. Valence counterclaimed for damages suffered because of the temporary injunction. After a jury verdict, the trial court rendered judgment denying a permanent injunction and awarding Valence $400,000 in damages.

Genco appeals, primarily asserting error in the court's charge and the trial court's interpretation of the jury verdict. We will reverse the trial court's judgment, render judgment that Valence take nothing on its counterclaim, and remand the cause for entry of a permanent injunction.

### Factual Background

Genco's Limestone Plant began operations in 1985 and is projected to continue operating for twenty or thirty more years. To produce electricity, the plant burns lignite coal from an adjacent mine near Jewett and coal from the Wyoming Powder River Basin. The coal burning process produces coal combustion products—such as fly ash and bottom ash—that require Genco to have a Class II industrial landfill to dispose of this waste.

In 1985, Genco deed-recorded approximately 450 acres of land for its landfill, which is regulated by the Texas Commission on Environmental Quality (TCEQ). It redesigned the landfill in 1994 to include an approximately 91–acre tract containing the location at which Valence wants to straight-hole drill its Holmes Unit No. 8 well. Genco deed-recorded this 91–acre tract as part of its industrial landfill and registered the landfill expansion with TCEQ.

The coal combustion products are disposed of in the landfill in predetermined areas called cells. Each cell has a three-foot clay liner to control rainwater and prevent water table contamination. The waste ash is placed on top of the clay to the allowable landfill plan height, and then the waste is covered by a three-foot clay layer. While the cell is open (waste is being actively deposited there), the cell is surrounded by a drainage ditch that controls and directs runoff water to a settling pond. Once a cell reaches the permitted height and grade, topsoil and grass are placed on top of the cell's clay cover, and the cell is considered closed. Genco cannot deposit waste over its entire landfill at one time because the TCEQ allows only a certain number of acres to be open at one time. TCEQ also regulates the height and grade of the landfill. Generally, the larger the overall area of the landfill's footprint, the higher the landfill can be built.

Valence proposed and obtained a Railroad Commission permit to straight-hole drill its Holmes No. 8 well in cell 20 of Genco's landfill. Genco is not currently depositing waste in that cell, but clay has been mined from it for use in closing other cells, and topsoil is being stored there. Based on projections, Genco plans to use cell 20 in seven to ten years.

Genco claimed that straight-hole drilling Holmes No. 8 in cell 20 would drastically impact the entire landfill's remaining life, reducing it from 11.37 years to 6.96 years, because it would remove a large area from the landfill footprint and require Genco to remove waste from closed cells to conform to the height requirement. Specifically, Genco alleged that Valence's straight-hole drilling of Holmes No. 8 would prevent the use of cells 15, 16, and 18 entirely, severely limit the use of cells 19 and 20, and cause moving the landfill's highpoint. Genco thus requested Valence to directionally

(slant-hole) drill Holmes No. 8, offering Valence the use of a corridor just outside the boundary of the landfill.

Upon the failure of negotiations—including Genco's gratuitous offer of $400,000, representing $200,000 for Holmes No. 8 and No. 9, to compensate Valence for the incremental cost of directionally drilling those two wells—Valence moved its crews and equipment onto the landfill to begin clearing away topsoil and building a pad site for Holmes No. 8. Genco filed suit and obtained a temporary restraining order and temporary injunction preventing Valence from straight-hole drilling Holmes No. 8. A jury trial was held on Genco's claim for a permanent injunction against straight-hole drilling and on Valence's claim for damages caused by the temporary injunction and resulting delay.

**The Accommodation Doctrine**

The dominant mineral estate has the right to reasonable use of the surface estate to produce minerals, but this right is to be exercised with due regard for the rights of the surface estate's owner. *Getty Oil Co. v. Jones,* 470 S.W.2d 618, 621 (Tex. 1971). This concept of "due regard," known as the accommodation doctrine, was first articulated in *Getty Oil* and balances the rights of the surface owner and the mineral owner in the use of the surface. *Tarrant County Water Control & Improvement Dist. No. 1 v. Haupt, Inc.,* 854 S.W.2d 909, 911 (Tex.1993) (*Haupt I*). Upon remand of *Haupt I,* we reiterated the elements of the accommodation doctrine that have been established by the supreme court:

[W]here there is an existing use by the surface owner which would otherwise be precluded or impaired, and where under the established practices in the industry there are alternatives available to the [mineral owner] whereby the minerals

can be recovered, the rules of reasonable usage of the surface may require the adoption of an alternative by the [mineral owner].

*Haupt, Inc. v. Tarrant County Water Control & Improvement Dist. No. 1*, 870 S.W.2d 350, 353 (Tex.App.-Waco 1994, no writ) (*Haupt II* ) (quoting *Getty Oil*, 470 S.W.2d at 622). And while we noted that the accommodation doctrine preserves the mineral owner's absolute right to use the surface if there is only one way to produce the minerals, we repeated the core of the accommodation doctrine:

*Getty recognizes that if there is but one means of surface use by which to produce the minerals, then the mineral owner has the right to pursue that use, regardless of surface damage.* [citation omitted]. On the other hand, if the mineral owner has reasonable alternative uses of the surface, one of which permits the surface owner to continue to use the surface in the manner intended (especially when there is only one reasonable manner in which the surface may be used)· and one of which would preclude that use by the surface owner, the mineral owner *must* use the alterna-

tive that allows continued use of the surface by the surface owner.[1] *Id.* (quoting *Haupt I*, 854 S.W.2d at 911–12) (emphasis in original); *see also id.* at 912–13 ("if reasonable alternative drilling methods exist that protect [the surface owner's existing use], then an accommodation by the mineral owners would be *required* ") (emphasis added). We then delineated the surface owner's burden of proof:

[T]he surface owner must show that the particular manner of surface use being challenged is not reasonably necessary to the mineral owner under all circumstances. *Haupt*, 854 S.W.2d at 911; *Getty Oil*, 470 S.W.2d at 623. This may be done by proving that the mineral owner has available other reasonable means of production, in addition to the method under attack, that will not interfere with the surface owner's existing use. *Id.* Moreover, the surface owner must also show that any alternative uses of the surface, other than the existing use, are impracticable and unreasonable under all the circumstances. *Getty Oil*, 470 S.W.2d at 623. All of these elements of the surface owner's burden are fact-sensitive and must be established

---

1. On rehearing, the supreme court in *Getty Oil* further explained the burden and elements:

[I]f there are other usual, customary and reasonable methods practiced in the industry on similar lands put to similar uses which would not interfere with the existing uses being made by the servient surface owner, it could be unreasonable for the lessee to employ an interfering method or manner of use. These considerations involve questions to be resolved by the trier of the facts.

A single or a multiple issue submission may be in order depending on the facts and circumstances in a given situation. The evidence and circumstances here are such that *a proper initial inquiry* would be whether Jones had reasonable means of developing his land for agricultural purposes

other than by ·use of the sprinkler system in question. If this is found to be the case, Jones must yield to the surface use adopted by Getty since it is not contended that the beam-type pumps installed by Getty are otherwise unreasonable. If such is not found to be the case, Jones is under the *burden of a second showing* that Getty's present manner and method of use on this land is unreasonable because there are alternative methods used in the industry on this type of property which are available to Getty whereby it can produce its wells without interfering with the existing uses of the servient estate being made by Jones. *If this is found to be the case, Getty is bound to convert to a noninterfering use.*

*Getty Oil*, 470 S.W.2d at 628 (op. on reh'g) (emphasis added).

either conclusively or by appropriate findings in determining the reasonable necessity of the mineral owner's surface use. *Haupt,* 854 S.W.2d at 911; *Getty Oil,* 470 S.W.2d at 623.

Thus, the Water District [the surface owner] had the burden of introducing evidence and obtaining findings necessary to establish that the plaintiffs [the mineral owners] had alternative means of access and that their use of the surface was not reasonably necessary because an alternative means of access was reasonable.

*Haupt II,* 870 S.W.2d at 353.

### The Jury Verdict and Genco's Issues

In this case, Genco requested a broad-form jury question on the accommodation doctrine.[2] The trial court rejected it, instead submitting Valence's three proposed questions.[3] In Question 1, the jury answered "yes" to the following question:

Do you find by a preponderance of the evidence that Texas Genco has an existing use of the surface at the Straight Hole Location that would be precluded or substantially impaired if Valence drills Well # 8 at the Straight Hole Location?

And the jury answered "yes" to Question 1(a), which asked:

Is directional drilling from an alternate location an established industry practice that would provide a reasonable alternative to recover the gas that Va-

lence would recover if it drilled Well # 8 at the Straight Hole Location?

But it is the jury's answer to Question 1(b) that led the trial court to enter a judgment in Valence's favor:

Do you find by a preponderance of the evidence that Valence's proposed use of the surface at the Straight Hole Location is an unreasonable use of the surface that requires Valence to directionally drill to recover its minerals from Well # 8?

The jury initially checked "yes" but then scratched out that checkmark and checked "no." In Question 2, which was conditioned on a "no" answer to Question 1, 1(a), or 1(b), the jury then awarded Valence $400,000 to compensate it for damages resulting from the issuance of the temporary restraining order and temporary injunction. Genco moved the trial court to disregard the jury's answer to Question 1(b), and Valence moved the trial court to disregard the jury's answers to Questions 1 and 1(a). The trial court denied both motions but entered a final judgment in Valence's favor.

 Genco's first issue argues that the jury's affirmative answers to Questions 1 and 1(a) established the elements of the accommodation doctrine and that Valence *must* accommodate Genco's existing use of the surface.[4] Based on the above discussion of the accommodation doctrine, we agree with Genco. The jury found that (1)

---

**2.** Genco is correct that the trial court should have submitted a broad-form charge. *See* Tex.R. Civ. P. 277 ("In all jury cases the court shall, whenever feasible, submit the cause upon broad-form questions.").

**3.** Genco objected to Valence's proposed charge at the charge conference, and the trial court stated on the record that it was refusing to submit Genco's proposed broad-form charge. Genco thus preserved its charge complaints for appeal. *See Dallas Mkt. Ctr.*

*Dev. Co. v. Liedeker,* 958 S.W.2d 382, 387 (Tex.1997), *overruled in part on other grounds by Torrington Co. v. Stutzman,* 46 S.W.3d 829 (Tex.2000); *State Dep't Hwys. & Pub. Transp. v. Payne,* 838 S.W.2d 235, 239–41 (Tex.1992).

**4.** Because this issue asserts a legal question on the effect of the jury findings, our standard of review is de novo. *See St. Joseph Hosp. v. Wolff,* 94 S.W.3d 513, 525 (Tex.2002).

Genco had an existing use that would be substantially impaired by Valence's straight-hole drilling its Holmes No. 8 well, and (2) directional drilling is a reasonable, industry-established, alternative method for Valence to access its gas. These findings established Valence's duty to accommodate Genco's surface use.[5] *See Haupt I*, 854 S.W.2d at 911–12; *Getty Oil*, 470 S.W.2d at 628.

Valence moved the trial court to disregard the jury's answers to Questions 1 and 1(a) on "no evidence" grounds. It makes the same argument as alternative reply points in its Appellee's Brief, asserting that the judgment should be affirmed because the evidence is legally insufficient to support the jury's answers.[6]

In reviewing the legal sufficiency of the evidence, we view the evidence in the light favorable to the verdict, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 807 (Tex.2005). There is legally insufficient evidence or "no evidence" of a vital fact when (a) there is a complete absence of evidence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; or (d) the evidence conclusively establishes the opposite of the vital fact. *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex.1997). More than a scintilla of evidence exists when the evidence supporting the finding, as a whole, "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Havner*, 953 S.W.2d at 711 (quoting *Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499 (Tex.1995)). If the evidence is so weak as to do no more than create a mere surmise or suspicion of its existence, its legal effect is that it is no evidence. *Haynes & Boone v. Bowser Bouldin, Ltd.*, 896 S.W.2d 179, 183 (Tex. 1995).

Ample evidence supports the jury's finding that Genco has an existing use of cell 20 that would be precluded or substantially impaired. Although waste is not currently being disposed of in cell 20, cell 20 is indisputably a part of the deed-recorded and state-registered landfill. Clay has been mined from cell 20, and topsoil is being stored there. If a well were drilled there, Genco would have to redesign other cells and lose the use of others. And sufficient evidence supports the jury's finding that directional drilling is a reasonable, industry-accepted alternative. Several witnesses testified that directional drilling is an established industry practice, and we have recognized that it is one of the "gen-

---

5. Valence asserts that the judgment should be affirmed because Genco failed to submit the accommodation doctrine element that Genco had no other reasonable use for the surface and that, because the judgment was in Valence's favor, there thus is a deemed finding that Genco has other reasonable uses of the surface. *See* Tex.R. Civ. P. 279. But no fact issue was raised on that element; it was not contested at trial, and the evidence conclusively established that Genco's only reasonable use of cell 20 was as a part of its landfill. A finding can be deemed on an omitted element only if a fact issue—supported by evidence—is raised. *See, e.g., Warren Petroleum Corp. v. Martin*, 153 Tex. 465, 271 S.W.2d

410, 412 (1954); *Freedom Homes of Tex., Inc. v. Dickinson*, 598 S.W.2d 714, 717 (Tex.Civ. App.-Corpus Christi 1980, writ ref'd n.r.e.). Because this element was uncontroverted and conclusively established at trial, a contrary finding cannot be deemed under Rule 279.

6. Because Valence does not seek to alter the judgment, it was not required to file a notice of appeal. *See* Tex.R.App. P. 25.1(c). And because it did not obtain a judgment notwithstanding the verdict, Valence is not required to bring cross-points. *Cf.* Tex.R.App. P. 38.2(b); Tex.R. Civ. P. 324(c).

erally established methods of production in the oil and gas industry." *Haupt II*, 870 S.W.2d at 355. On the issue of the reasonableness of directional drilling as an economically viable alternative, which Valence disputed because of the increased cost and alleged decreased yield, Genco presented evidence that Valence's cost estimates were too high and that Valence could extract all of the gas. Moreover, the evidence (testimony by Valence's CEO and COO) showed that regardless of the costs and decreased yield, the projected $15 to $25 million in gas reserves in Holmes No. 8 warrant Valence's directional drilling, regardless of the increased costs. In conclusion, legally sufficient evidence supports the jury's answers to Questions 1 and 1(a).

▬ In its second issue, Genco asserts that the trial court should have rendered judgment in its favor and should have disregarded the jury's answer to Question 1(b). We agree. A jury question should be disregarded if it is immaterial. *Southeastern Pipe Line Co. v. Tichacek*, 997 S.W.2d 166, 172 (Tex.1999). "A question is immaterial when it should not have been submitted, it calls for a finding beyond the province of the jury, such as a question of law, or when it was properly submitted but has been rendered immaterial by other findings." *Id.* Because Questions 1 and 1(a) submitted the necessary elements to establish the accommodation doctrine, Question 1(b) was superfluous and should not have been submitted. *See Hyundai Motor Co. v. Rodriguez*, 995 S.W.2d 661, 665–66 (Tex.1999) (trial court should not submit differently worded questions that call for same factual finding "to avoid confusing the jury and the possibility of inconsistent findings"). Additionally, while we believe Question 1(b) should not have been submitted, the jury's specific findings in its answers to Questions 1 and 1(a) nonethe-

less render immaterial the answer to Question 1(b), which was confusing and lacked accompanying instructions.

## Conclusion

The trial court erred in refusing to disregard the answer to Question 1(b). This error was reversible because it resulted in an improper judgment. Tex.R.App. P. 44.1(a). The trial court erred in not rendering a final judgment granting a permanent injunction in favor of Genco based on the jury's answers to Questions 1 and 1(a). We sustain Genco's first and second issues.[7] We reverse the trial court's judgment and render judgment that Valence take nothing on its counterclaim. We remand the cause to the trial court for entry of a permanent injunction consistent with this opinion.

Special Note by Chief Justice GRAY.

TOM GRAY, Chief Justice.

### SPECIAL NOTE

The majority issued an opinion in this case on January 18, 2006. The signature block correctly indicates that I am on the panel. But the signature block failed to note the information that I had communicated to the author regarding my ability, or inability, to vote on the opinion and judgment. I received this query from Justice Vance:

> Reminder: the issue date is January 18. Please let us know how to show your opinion, i.e., dissenting, concurring, etc.

I responded:

> Thanks for the reminder, but I have not had an adequate amount of time to evaluate the issues in this appeal so I do not know what to tell you.

---

7. Because of our disposition, we need not address Genco's other issues.

As with other cases[1] in which Justices Reyna and Vance have elected to issue their opinion without awaiting on my vote, there are serious issues presented in this appeal. I cannot vote on the result in a case until I have had adequate time to study the issues presented. This is not the only case on which I must cast a vote and it must be appropriately balanced with other priorities.

Thus, to avoid leaving the appearance that I agree with the opinion and judgment, this Special Note is simply to advise you that at the time the majority issued its opinion, I was not, nor am I currently, in a position to cast a vote on the issues presented in this appeal. Thus, I can neither concur nor dissent.

---

1. *Tesmec USA, Inc. v. Whittington*, No. 10–04–00301–CV, 2005 WL 3677206, 2005 Tex.App. LEXIS —— (Tex.App.—Waco Jan. 18, 2006, no pet h.) (Special Note by Chief Justice Gray issued Jan. 25, 2006); *Park v. Montgomery County*, No. 10–04–00231–CV, 2005 WL 2667488, 2005 Tex.App. LEXIS 8646 (Tex. App.—Waco Oct. 19, 2005, pet. filed) (Special Note by Chief Justice Gray, No. 10–04–00231–CV, 2005 WL 2667488, 2005 Tex.App. LEXIS 8659 (Tex.App.—Waco Oct. 19, 2005));

*Pac. Emplrs. Ins. Co. v. Mathison*, No. 10–04–00314–CV, 2005 WL 2665454, 2005 Tex.App. LEXIS 8650 (Tex.App.—Waco Oct. 19, 2005, no pet.) (Special Note by Chief Justice Gray, No. 10–04–00314–CV, 2005 WL 2665454, 2005 Tex.App. LEXIS 8660 (Tex.App.—Waco Oct. 19, 2005)); *Krumnow v. Krumnow*, 174 S.W.3d 820, 830–842 (Tex.App.—Waco August 24, 2005, pet. filed) (Special Note by Chief Justice Gray issued August 31, 2005).