**VALENCE OPERATING COMPANY,**
**Appellant,**

**v.**

**TEXAS GENCO, LP, Appellee.**

**No. 10–06–00252–CV.**

Court of Appeals of Texas,
Waco.

Feb. 27, 2008.

Brian D. Melton, Susman Godfrey LLP, Roger Townsend, Alexander Dubose Jones & Townsend, LLP, Houston, Bobby Reed, Reed & Reed, LLP, Groesbeck, for appellant.

John Anaipakos, Baker & Botts, LLP, Houston, Joe B. Cannon, Cannon & Simmons, Groesbeck, David E. Jackson, Jackson Sjoberg McCarthy & Wilson, Austin, for appellee.

Before Justice VANCE, Justice REYNA, and Judge ANDERSON.*

## OPINION

BILL VANCE, Justice.

In this accommodation doctrine case, Appellee Texas Genco, LP sought a permanent injunction to prevent Appellant Valence Operating Co. from drilling Well No. 9 of its Holmes "A" Gas Unit[1] within cells 8 and 12 of Texas Genco's ash-disposal landfill. Valence, which has mineral rights in the Holmes Unit, obtained a per-

---

* Hon. Ken Anderson, Judge of the 277th District Court of Williamson County, sitting by assignment of the Chief Justice of the Texas Supreme Court. Judge Anderson's appoint-

ment was necessitated by Chief Justice Gray's recusal.

1. The Holmes Unit is a 679.65–acre pooled unit that includes Valence's mineral interests.

mit from the Railroad Commission to drill Well 9 as a 297–foot directional well (referred to by the parties and in this opinion as the 300–foot directional well). The trial court entered a temporary injunction, and Valence counterclaimed for damages for wrongful temporary injunction and for declaratory relief that it could also drill Well 9 as a straight-hole well. A jury found for Texas Genco on all issues, and the trial court issued a permanent injunction and ordered that Valence take nothing on its counterclaim.

Valence appeals, complaining in five issues about the jury charge and the sufficiency of the evidence. We will affirm.

## Background

These parties were recently before us in what they call the "Well 8" case. *See Texas Genco, LP v. Valence Operating Co.*, 187 S.W.3d 118 (Tex.App.-Waco 2006, pet. denied). Because the landfill's background facts are essentially identical, we borrow them from the Well 8 case:

> Genco's Limestone Plant began operations in 1985 and is projected to continue operating for twenty or thirty more years. To produce electricity, the plant burns lignite coal from an adjacent mine near Jewett and coal from the Wyoming Powder River Basin. The coal burning process produces coal combustion products—such as fly ash and bottom ash— that require Genco to have a Class II industrial landfill to dispose of this waste.
>
> In 1985, Genco deed-recorded approximately 450 acres [2] of land for its landfill, which is regulated by the Texas Commission on Environmental Quality (TCEQ). It redesigned the landfill in

1994 to include an approximately 91–acre tract containing the location at which Valence wants to straight-hole drill its Holmes Unit No. 8 well. Genco deed-recorded this 91–acre tract as part of its industrial landfill and registered the landfill expansion with TCEQ.[3]

> The coal combustion products are disposed of in the landfill in predetermined areas called cells. Each cell has a three-foot clay liner to control rainwater and prevent water table contamination. The waste ash is placed on top of the clay to the allowable landfill plan height, and then the waste is covered by a three-foot clay layer. While the cell is open (waste is being actively deposited there), the cell is surrounded by a drainage ditch that controls and directs runoff water to a settling pond. Once a cell reaches the permitted height and grade, topsoil and grass are placed on top of the cell's clay cover, and the cell is considered closed. Genco cannot deposit waste over its entire landfill at one time because the TCEQ allows only a certain number of acres to be open at one time. TCEQ also regulates the height and grade of the landfill. Generally, the larger the overall area of the landfill's footprint, the higher the landfill can be built.

*Id.* at 120–21.

When the landfill began operations in 1985, there was one preexisting gas well (the Holmes A–1 Well, drilled by Valence's predecessor in 1979) within the landfill's footprint, *i.e.*, the area used and to be used for ash disposal. The landfill's initial cell sequencing order was designed to avoid the A–1 Well, and Texas Genco (then known as Houston Lighting & Power) ex-

---

**2.** This area includes a 392–acre tract and a 55–acre tract that has never been used for landfill operations.

**3.** In 1997, Texas Genco deed-recorded and registered another 99 acres adjacent to the 91–acre tract.

pected that it would be depleted and plugged by the time the cell progression reached it. Texas Genco thus began filling its landfill counter-clockwise away from the A–1 Well. Over the next thirteen years, Texas Genco filled and closed cells 1 through 5 with no additional gas drilling activity in the landfill area.[4]

In 1998, while Texas Genco was working on cell 6 and preparing to move to cell 9, Valence drilled two wells (the Reed E–4 and Reed E–5) just inside the landfill's border. At that time, Texas Genco was willing and able to "notch around" those wells because they were located at the landfill's very edge and Texas Genco believed it had viable landfill options in other directions. Another five years then passed with no gas drilling activity in the landfill area, and the landfill progressed through cells 9 and 10. In 2003, Valence drilled Well 3, which Texas Genco was again able to notch around because it was at the landfill's outer edge. Valence then drilled Wells 4, 5, and 7, which removed Texas Genco's option to expand the landfill to the east, northeast, and north. Because Texas Genco's landfill was in effect surrounded by wells, which eliminated all possible options for expansion of the landfill, Texas Genco objected to Valence's proposals to drill Wells 8 and 9 within the landfill's footprint and attempted to persuade Valence to directionally drill the wells.

The Well 8 and Well 9 lawsuits followed. In the Well 8 case, we held that the evidence was sufficient to support favorable jury findings for Texas Genco on its accommodation doctrine claim with respect to cell 20 of the landfill. Based largely on our Well 8 opinion, in the present case the trial court submitted the following jury questions:

**QUESTION NO. 1**

Do you find that Texas Genco has no other practicable and reasonable use of the surface at the proposed Well No. 9 Surface Location other than as a landfill?

Answer "Yes" or "No" _____

**QUESTION NO. 2**

Is Valence's proposed drilling at the Well No. 9 Surface Location not reasonably necessary?

*Instructions*

You are instructed that Valence's proposed use of the surface at the Well No. 9 Surface Location is not reasonably necessary if:

(1) Texas Genco has an existing use of the surface at the proposed Well No. 9 Surface Location that would be precluded or substantially impaired if Valence drills Well No. 9 at that location, and

(2) directional drilling is an industry-established practice that provides Valence reasonable access to its minerals.

Answer "Yes" or "No" _____

The jury answered "yes" to both questions. Valence does not complain about Question No. 1 in this appeal. Thus, we focus on the issues that address Question No. 2, as well as issues of law.

**Issues on Appeal**

Valence raises five issues:

1. Does the accommodation doctrine give Texas Genco the power to force Valence to drill Holmes Unit Well No. 9 from a location outside the

4. In 1979, Railroad Commission rules allowed only one well per 640 acres. By 2000, the limit was one well per forty acres, under which sixteen or seventeen wells could be drilled on the Holmes Unit.

boundaries of its lease and the Holmes unit?

2. Is the accommodation doctrine so broad that Texas Genco can force Valence to drill a Holmes Unit well through the Reed E Unit, in the absence of legally and factually insufficient evidence that Valence would not become liable to others by doing so?

3. Was there legally and factually sufficient evidence of substantial impairment of Texas Genco's *existing use* of the surface when Texas Genco relied on a "modified landfill footprint," created after it sued for an injunction, to prove that element of its claim?

4. Did the trial court err in submitting a single broad-form question on the accommodation doctrine, inquiring about multiple proposed surface locations, when the evidence with respect to the two proposed surface locations at issue was so different that a reasonable jury could have answered "yes" as to one location and "no" as to the other?

5. Did the trial court err in instructing the jury that it was not reasonably necessary for Valence to use its proposed surface locations if directional drilling was "an industry-established practice that provides Valence reasonable access to its minerals" when a reasonable jury could have concluded that Valence's proposed 300–foot directional well located on the Holmes unit met that definition, but that Texas Genco's proposed 1000–foot directional well through the Reed E unit did not?

### The Accommodation Doctrine

In the Well 8 case, we set forth the contours of the accommodation doctrine:

The dominant mineral estate has the right to reasonable use of the surface estate to produce minerals, but this right is to be exercised with due regard for the rights of the surface estate's owner. *Getty Oil Co. v. Jones,* 470 S.W.2d 618, 621 (Tex.1971). This concept of "due regard," known as the accommodation doctrine, was first articulated in *Getty Oil* and balances the rights of the surface owner and the mineral owner in the use of the surface. *Tarrant County Water Control & Improvement Dist. No. 1 v. Haupt, Inc.,* 854 S.W.2d 909, 911 (Tex.1993) (*Haupt I*). Upon remand of *Haupt I*, we reiterated the elements of the accommodation doctrine that have been established by the supreme court:

> [W]here there is an existing use by the surface owner which would otherwise be precluded or impaired, and where under the established practices in the industry there are alternatives available to the [mineral owner] whereby the minerals can be recovered, the rules of reasonable usage of the surface may require the adoption of an alternative by the [mineral owner].

*Haupt, Inc. v. Tarrant County Water Control & Improvement Dist. No. 1,* 870 S.W.2d 350, 353 (Tex.App.-Waco 1994, no writ) (*Haupt II*) (quoting *Getty Oil,* 470 S.W.2d at 622). And while we noted that the accommodation doctrine preserves the mineral owner's absolute right to use the surface if there is only one way to produce the minerals, we repeated the core of the accommodation doctrine:

> *Getty recognizes that if there is but one means of surface use by which to produce the minerals, then the mineral owner has the right to pursue that use, regardless of surface damage.* [ci-

tation omitted]. On the other hand, if the mineral owner has reasonable alternative uses of the surface, one of which permits the surface owner to continue to use the surface in the manner intended (especially when there is only one reasonable manner in which the surface may be used) and one of which would preclude that use by the surface owner, the mineral owner *must* use the alternative that allows continued use of the surface by the surface owner.

*Id.* (quoting *Haupt I*, 854 S.W.2d at 911–12) (emphasis in original); *see also id.* at 912–13 ("if reasonable alternative drilling methods exist that protect [the surface owner's existing use], then an accommodation by the mineral owners would be *required*") (emphasis added). We then delineated the surface owner's burden of proof:

> [T]he surface owner must show that the particular manner of surface use being challenged is not reasonably necessary to the mineral owner under all circumstances. *Haupt*, 854 S.W.2d at 911; *Getty Oil*, 470 S.W.2d at 623. This may be done by proving that the mineral owner has available other reasonable means of production, in addition to the method under attack, that will not interfere with the surface owner's existing use. *Id.* Moreover, the surface owner must also show that any alternative uses of the surface, other than the existing use, are impracticable and unreasonable under all the circumstances. *Getty Oil*, 470 S.W.2d at 623. All of these elements of the surface owner's burden are fact-sensitive and must be established either conclusively or by appropriate

findings in determining the reasonable necessity of the mineral owner's surface use. *Haupt*, 854 S.W.2d at 911; *Getty Oil*, 470 S.W.2d at 623.

Thus, the Water District [the surface owner] had the burden of introducing evidence and obtaining findings necessary to establish that the plaintiffs [the mineral owners] had alternative means of access and that their use of the surface was not reasonably necessary because an alternative means of access was reasonable.

*Haupt II*, 870 S.W.2d at 353.

*Texas Genco*, 187 S.W.3d at 121–23 (footnote omitted) (italics in original).

### Accommodation Off the Premises?

Valence's first two issues concern its claim that Texas Genco is forcing Valence to drill from a location outside the surface of the Holmes Unit and that the trial court erred in rendering a judgment that, in effect, allows Texas Genco to force Valence to drill Well 9 off of the Holmes Unit surface. Among other Well 9 locations suggested by Texas Genco was a location next to Well 5 of the adjacent Reed E Unit (also located on Texas Genco's surface), as Texas Genco had obtained written consent for the drilling of Well 9 from XTO Energy, the Reed E Unit operator, in part for Valence's convenience because it could co-locate the Well 9 pad with an existing well pad.[5] Valence asserts that, because Texas Genco did not prove with legally and factually sufficient evidence that Valence can accommodate Texas Genco's surface use on the Holmes Unit, Texas Genco is not entitled to an accommodation.[6]

---

**5.** XTO and Valence own over 95% of the working interest in the Reed E Unit, and XTO agreed to waive any subsurface trespass claims against Valence.

**6.** In reviewing the legal sufficiency of the evidence, we view the evidence in the light most favorable to the verdict, crediting favorable evidence if reasonable jurors could, and

We acknowledge Valence's complaint about the questionable extension of the accommodation doctrine that would require the mineral owner to use an off-unit (also referred to herein as off-lease) surface location,[7] but we ultimately need not reach that issue because Texas Genco presented legally and factually sufficient evidence of several on-unit locations outside of the landfill's ash disposal area that the jury could have found to provide Valence reasonable access to its minerals by directional drilling.[8]

Texas Genco points out that its aim is not to force Valence to drill outside the Holmes Unit's boundary but to have Valence drill outside of the landfill area available for ash disposal, i.e., the landfill's "footprint." Texas Genco's brief cites to its witnesses' testimony that "they will gladly work with Valence to allow it to drill wells anywhere outside the *ash disposal area* of its landfill, without regard for the deed-recorded boundary.... [T]he only criteria for an acceptable location was that it be located outside the landfill's ash disposal area." (Appellee's Brief at 34, 41). We construe Texas Genco's position to be that there are one or more on-unit locations inside the landfill's deed-recorded acreage, but outside the actual ash disposal area, for which Texas Genco will not oppose Valence's directional drilling of Well 9.[9]

Texas Genco's experts and its plant manager all testified to acceptable on-unit locations, and Valence did not challenge at

---

disregarding contrary evidence unless reasonable jurors could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 822 (Tex.2005). There is legally insufficient evidence or "no evidence" of a vital fact when (a) there is a complete absence of evidence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; or (d) the evidence conclusively establishes the opposite of the vital fact. *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex.1997). In reviewing the factual sufficiency of the evidence, we must consider and weigh all of the evidence, not just the evidence that supports the verdict. *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406–07 (Tex.1998); *Checker Bag Co. v. Washington*, 27 S.W.3d 625, 633 (Tex.App.-Waco 2000, pet. denied). We will set aside the finding only if it is so contrary to the overwhelming weight of the evidence that the finding is clearly wrong and unjust. *Ellis*, 971 S.W.2d at 407.

7. *See Sun Oil Co. v. Whitaker*, 483 S.W.2d 808, 812 (Tex.1972) (stating that accommodation doctrine articulated in *Getty Oil* is "limited to situations in which there are reasonable alternative methods that may be employed by the lessee *on the leased premises* to accom-plish the purposes of the lease.") (emphasis added); Owen L. Anderson, *Geophysical "Trespass" Revisited*, 5 Tex. Wesleyan L.Rev. 137, 182 & n. 200 (1999) ("Under the Texas accommodation doctrine, for an alternative to be reasonable, *it must be available on the land in question*.") (emphasis added). *Sun Oil* is distinguishable, however, because it did not involve conflicting uses of the surface between the surface owner and mineral owner; rather, it involved whether the mineral owner was entitled to freely use subsurface water owned by the surface owner or whether it should be required to purchase water from someone other than the surface owner. *Sun Oil*, 483 S.W.2d at 812.

8. Also, because Valence does not challenge on appeal the trial court's admission of evidence relating to the off-unit locations, that evidence was properly before the jury in this case.

9. Whether Texas Genco's position necessitates a modification of the judgment is an issue that can be raised in a motion for rehearing, as the judgment enjoins Valence from drilling "Well 9 at any location within (i) Cells 8 and/or 12 of [Texas Genco's landfill] ..., but only to the extent any such location is also included within (ii) the boundaries of the 392.258–acre and 91.217–acre deed recorded tracts...."

least two on-unit locations.[10] The experts opined that the ability to directionally drill Well 9 approximately 1,000 to 1,150 feet from its "bottom-hole" location is industry-established and technically and economically feasible. Because there is legally and factually sufficient evidence of on-unit locations outside of the actual ash disposal area, we overrule Valence's first two issues.

### Existing Use

■ Issue three complains of the legal and factual sufficiency of the evidence that Valence's permitted location for Well 9 (the 300–foot location) would substantially impair Texas Genco's existing use of its landfill. Rather than challenging the evidence on Texas Genco's existing use of cells 8 and 12, Valence focuses its complaint on a statement in Texas Genco's pleading that the "9A Alt." 772–foot location (which Texas Genco had offered as part of a package deal to resolve Wells 6, 8, and 9 but was never accepted by Valence) was "at the boundary of the Disposal Site" and "off the landfill." Valence then interjects that, after Texas Genco withdrew its 9A Alt. location, between the time it filed suit and the trial, Texas Genco created a modified landfill footprint that expanded the available disposal area to the east. Valence asserts that the modified footprint was done so that both the 9A Alt. location and the permitted 300–foot location would appear on paper to be further *within* the landfill's footprint, rather than "at the boundary of the Disposal Site" and "off the landfill." Thus, Valence concludes, the 300–foot location—a "stone's throw" from Texas Genco's 9A Alt. location—could not substantially impair Texas

Genco's existing use, by Texas Genco's own admission.

We first note that Texas Genco presented legally and factually sufficient evidence of substantial impairment of its existing use of the landfill with respect to cells 8 and 12 and the 300–foot location. Cells 8 and 12 are within the landfill's footprint. While ash has not been deposited in them yet, disposal in cell 7 was near completion, about half of cell 8 had been prepared with a clay liner for depositing ash, and topsoil and clay had been mined from cell 12 for use in other cells. Texas Genco presented testimony that drilling at the 300–foot location would change the geometry of the landfill, would require ash removal from cell 4, and likely require ash removal from cell 10. These changes would cut 2.2 years (about 20%) of the estimated 11–year remaining life of the landfill. This evidence is sufficient. *See Texas Genco*, 187 S.W.3d at 124.

As for the modified landfill footprint, Texas Genco's plant manager explained that, as a result of the landfill's being surrounded by gas wells and learning of Valence's proposal for still more wells, Texas Genco modified its plan for ash disposal to maximize "every available square inch" of space on the landfill's eastern side. The jury was free to believe this explanation over Valence's allegation that Texas Genco modified the footprint just to improve its litigation position. And finally, if we were to assume that the 772–foot 9A Alt. location is at the "boundary of the Disposal Site," we agree with Texas Genco that it does not follow that Texas Genco does not have an existing use that would be substantially impaired by Valence's directional drilling at the permitted *300–foot* location, which is not a "stone's throw"

---

**10.** We thus need not address the parties' arguments on subsurface trespass if Valence

were to directionally drill from the Reed Unit.

from the *772–foot* 9A Alt. location. The jury was free to reject that argument as well. We overrule Valence's third issue.

## Charge Issues

In the Well 8 case, we noted that the trial court should have submitted a broad-form charge. *See Texas Genco,* 187 S.W.3d at 123 n. 2. The trial court did so in this case.

■ In issues four and five, Valence complains about the definitions and instructions accompanying Question No. 2. The charge defined "Well No. 9 Surface Location" as "the sites within Cells 8 and/or 12 in Texas Genco's Landfill in which Valence proposes drilling Well No. 9." Issue four complains that the trial court erred in defining "Well No. 9 Surface Location" to include both Valence's straight-hole location and the 300–foot permitted location and that the trial court erred in rejecting Valence's proposed separate questions for each location. We review a trial court's rulings on questions, instructions, and definitions to be included in a jury charge under an abuse-of-discretion standard. *Gilmore v. SCI Tex. Funeral Servs., Inc.,* 234 S.W.3d 251, 261 (Tex.App.-Waco 2007, pet. denied).

■ Valence asserts that the trial court erred in failing to ask separate questions and in its definition of "Well No. 9 Surface Location" because the evidence about those two locations differed and such error was harmful because: (1) the "jury could have reasonably concluded that Texas Genco had an existing use at the straight-hole location, but not at the permitted [300–foot] location where Valence was willing to directionally drill" (which, as we noted above, Valence charged was "at the boundary of the Disposal Site," by Texas Genco's own admission); and (2) "the jury could have concluded from this evidence that Texas Genco's use of the surface

would be precluded or substantially impaired at the straight-hole location, but not at the permitted location." Thus, Valence concludes, under the definition given, "the jury's answer would be the same no matter which of these conclusions it reached."

Texas Genco's "breach of accommodation doctrine" claim sought as a remedy an injunction prohibiting Valence from drilling Well 9 within the disposal site and pled that its use of the disposal site was preexisting and would be impaired by Valence's drilling Well 9 within the disposal site. Valence counterclaimed, seeking a declaratory judgment that it was not required to accommodate the straight-hole and 300–foot locations. On issue four, Texas Genco responds that it was not error to submit Texas Genco's broader accommodation doctrine claim, rather than Valence's narrower two-location counterclaim for declaratory judgment that was subsumed within Texas Genco's broader claim. We agree.

Valence's counterclaim—which essentially was a denial of Texas Genco's claim—was subsumed within the broader relief that Texas Genco sought. *Cf. National Enter., Inc. v. E.N.E. Props.,* 167 S.W.3d 39, 43–44 (Tex.App.-Waco 2005, no pet.). The trial court's broad-form submission about cells 8 and 12 put both Texas Genco's broader claim for relief and Valence's narrower claim squarely before the jury. Thus, the trial court did not abuse its discretion in refusing to submit separately Valence's narrow counterclaim.

■ We also agree with Texas Genco that harm could not result to Valence if the jury concluded that Texas Genco had an existing use at one location (*i.e.,* the straight-hole location) but not at the other location, or that Texas Genco's use of the surface would be substantially impaired at one location, but not at the other. Under the definition given, the jury's answer

would be the same no matter which of the conclusions it reached, but either conclusion would have compelled a "no" answer to Question No. 2 and would have inured to Valence's benefit. As Question No. 2 was submitted, Texas Genco had to prove existing use and substantial impairment at all proposed drilling sites within cells 8 and 12 to obtain a favorable jury finding.[11] Moreover, submitting separately the two specific locations—rather than all of cells 8 and 12 broadly—could have led to further litigation over cells 8 and 12 because Valence could have sought to drill elsewhere within those cells if it did not prevail on only the two specific locations. We overrule issue four.

█ Issue five complains that Question No. 2 is erroneous because it fails to inquire about the reasonableness of the alternative access to the minerals in that its second instruction on directional drilling is not fact-specific. Valence posits that "the jury could have thought that a 300–foot directional well was reasonable, but that a 1000–foot directional well was not." Thus, Valence concludes, "the jury was instructed to answer the broad-form question if *any* kind of directional drilling was an industry-established practice providing reasonable access to the minerals."

We do not accept Valence's isolation of the second instruction. Instead, it must be read in the context of all of Question No. 2 and the evidence. "Well No. 9 Surface Location" was defined in the charge as "the sites within Cells 8 and/or 12 in Texas Genco's Landfill in which Valence proposes drilling Well No. 9." Texas Genco aptly responds that, because the 300–foot location is indisputably within cells 8 and 12 and the 1000–foot location is not, by finding that Valence's drilling at the Well 9 surface location "is not reasonably necessary," the jury could not logically have believed that directional drilling from the 300–foot location (or any other location within cells 8 or 12) provides Valence reasonable access to its minerals, but that drilling from somewhere outside cells 8 or 12 would not provide reasonable access. In other words, for the jury to find that drilling within cells 8 or 12 is not reasonably necessary, they jury had to conclude that directional drilling from somewhere outside cells 8 and 12—including the 1000–foot location—provides Valence reasonable access.

Valence also contends that the jury could have thought that a directional well on the Holmes Unit was reasonable while a directional well from another unit was not. But as we noted above, there was evidence of on-unit locations outside of cells 8 and 12, and the jury was entitled to base its answer to Question No. 2 on that evidence. Again, we note that Valence does not complain on appeal of the improper admission of evidence about the off-unit locations. Thus, we disagree that there could have been a commingling of valid and invalid theories, which in any event was not the subject of a specific objection

---

11. In its reply brief, Valence complains that harm exists because Question No. 2 improperly commingled valid and invalid theories of liability. *See Harris County v. Smith,* 96 S.W.3d 230, 233–34 (Tex.2002); *Crown Life Ins. Co. v. Casteel,* 22 S.W.3d 378, 388 (Tex. 2000). Valence, however, does not pinpoint an invalid theory of liability, and there was evidentiary support for the jury's finding as to all of cells 8 and 12. Additionally, this particular complaint is not preserved for appeal because it was not timely and specifically made in the charge conference. *See Casteel,* 22 S.W.3d at 389 ("When a single broad-form liability question erroneously commingles valid and invalid liability theories *and the appellant's objection is timely and specific,* the error is harmful when it cannot be determined whether the improperly submitted theories formed the sole basis for the jury's finding.") (emphasis added).

to the charge in the trial court. For the above reasons, we overrule issue five.

## Conclusion

Having overruled all of Valence's issues, we affirm the trial court's final judgment and permanent injunction.