**Opinion issued March 7, 2013**



**In The**

# Court of Appeals

**For The**

# First District of Texas

_____

**NO. 01-10-00350-CV**

_____

**KEY OPERATING & EQUIPMENT, INC., Appellant**

**V.**

**WILL HEGAR AND LOREE HEGAR, Appellees**

---

**On Appeal from the 21st District Court**
**Washington County, Texas**
**Trial Court Case No. 33,968**

---

## DISSENTING OPINION ON REHEARING

For all of the following reasons, I respectfully dissent.[1]

---

[1] Despite repeated requests from the Court to do so, Key Operating declined to respond to the Hegars' motion for rehearing. Thus, this panel did not have the

***"This is not an accommodation doctrine case."***

The majority attempts to resolve this case based upon the common law accommodation doctrine, which it holds applies to this case—a point which even the Hegars dispute.

Under Texas law, the dominant mineral estate has the right to reasonable use of the surface estate to produce minerals, but this right is to be exercised with due regard for the rights of the surface estate's owner. *Getty Oil Co. v. Jones*, 470 S.W.2d 618, 621 (Tex. 1971). This concept of "due regard," which is known as the accommodation or alternative means doctrine, was first articulated in *Getty Oil* and balances the rights of the surface owner and the mineral owner in the use of the surface. *Tarrant Cnty. Water Control & Improvement Dist. No. 1 v. Haupt, Inc.*, 854 S.W.2d 909, 911 (Tex. 1993). Under this common law doctrine, "where there is an existing use by the surface owner which would otherwise be precluded or impaired, and where under the established practices in the industry there are alternatives available to the lessee whereby the minerals can be recovered, the rules of reasonable usage of the surface may require the adoption of an alternative by the lessee." *Getty Oil*, 470 S.W.2d at 622; *see also Haupt*, 854 S.W.2d at 913 ("if reasonable alternative drilling methods exist that protect [the surface owner's

benefit of an industry perspective when considering the Hegars' motion for rehearing.

2

existing use], then an accommodation by the mineral owners would be required"). The surface owner bears the burden of proving the applicability of the accommodation doctrine. *Haupt*, 854 S.W.2d at 911; *Getty Oil*, 470 S.W.2d at 623.

The majority's reliance upon the accommodation doctrine is problematic for several reasons. First, as the Hegars acknowledged in their motion for rehearing, "This is not an accommodation doctrine case." Unlike typical accommodation doctrine cases, the Hegars are not contending that Key Operating's efforts to develop the mineral estate under the Hegar tract are interfering with the Hegars' existing use of the surface. *See Getty Oil*, 470 S.W.2d at 622 (mineral lessee's pumping units interfered with surface owner's operation of automatic irrigation sprinkler system); *Valence Operating Co. v. Tex. Genco, LP*, 255 S.W.3d 210, 215–16 (Tex. App.—Waco 2008, no pet.) (location of proposed gas well interfered with surface owner's existing ash-disposal landfill operations); *Merriman v. XTO Energy, Inc.*, No. 10–09–00276–CV, 2011 WL 1901987, at \*4 (Tex. App.—Waco May 11, 2011, pet. granted) (mem. op.) (location of well interfered with surface owner's existing cattle operations). In fact, the Hegars do not dispute Key Operating's right to use the roadway to develop the minerals under the Hegar tract, nor do they have an issue with the manner in which Key Operating is using the

roadway. Their only dispute is whether Key Operating has the right to use the roadway in order to develop the mineral estate of an adjacent tract.

Second, by resolving this matter under the accommodation doctrine, the majority has effectively determined that the Hegars—who unequivocally dispute the applicability of the accommodation doctrine to their case and did not seek to enjoin Key Operating's use of the surface on this basis—nevertheless, somehow managed to prove the applicability of said doctrine.

Third, although the applicability of the accommodation or alternative means doctrine depends upon the language utilized by the deed, lease, or other instrument severing the mineral and surface estates, the majority opinion presumes that the doctrine applies and never identifies—much less analyzes—the severing instrument. *See Landreth v. Melendez*, 948 S.W.2d 76, 81 (Tex. App.—Amarillo 1997, no writ). In *Landreth*, the Amarillo Court of Appeals held that the accommodation doctrine was inapplicable because the conveying instrument expressly gave the mineral interest owner the right to use as much of the surface as was required in employing "all usual, necessary and convenient means" to further explore for, produce and remove the minerals. 948 S.W.2d at 81. Thus, the mineral interest owners were "under no obligation to accommodate the surface owners in the existing use made of the surface so long as the mineral owners use all usual, necessary and convenient means in conducting their operations." *Id.*

4

### *Surface Usage Rights and Time of Severance*

The majority contends that Key Operating is attempting to "contractually expand their surface rights against the Hegars in a lease and a pooling agreement entered after the mineral and surface estates were severed"—without ever establishing what Key Operating's surface rights *actually* are in this case.

The majority acknowledges that a mineral interest owner's surface usage rights are generally established at the time of severance, citing to 1 Ernest E. Smith & Jacqueline Lang Weaver, Texas Oil and Gas Law, section 2.1[B][1] at 2.17–18.2–18. Nevertheless, the majority never clearly articulates *when* Key Operating's mineral interest was actually severed from the surface or identifies the severing instrument—a document which would undoubtedly impact the analysis in this case. For example, if the severing instrument gave Key Operating's predecessor the right to pool or otherwise use the surface of the Rosenbaum-Curbo tract (a portion of which was later sold to the Hegars) for the benefit of oil and gas development on adjacent tracts, there would be no question that Key Operating was entitled to use the surface to develop the pooled unit's mineral interest.

### *Factual Misstatements and/or Omissions*

Aside from these analytical issues, the majority opinion also makes two factual misstatements or omissions which bear mentioning.

5

First, the majority acknowledges that because an oil and gas lease grants a fee simple determinable interest to the lessee/grantee, the execution of a mineral lease severs the mineral estate from the surface estate. Despite the existence of several oil and gas leases in the Hegars' chain of title, some of which are expressly listed in the Warranty Deed from Charles Curbo, including the 1994 lease in which Curbo leased his entire mineral interest to Boatright, the majority nevertheless declares: "The Hegars' one-fourth interest in the mineral estate does not appear to have ever been severed from the surface."

Second, Will Hegar testified, "We're trying to raise a family and we can't do it with a highway going through our property." Collectively, the Hegars and Key Operating hold an undivided interest in a little over one-third of the mineral estate. The remaining two-thirds is held by various other co-tenants—each of whom also has the unilateral right to use as much of the surface estate as is reasonably necessary to produce and remove the minerals from the property. Until those minerals are depleted or the Hegars acquire 100% of the mineral estate associated with their 85-acre parcel, it is unlikely that the Hegars will ever have the peace and solitude they seek. The roadway in question is the only means of egress and ingress that the Key Operating and the other mineral co-tenants have with respect to the property. While the proximity of the Hegar family home to the busy roadway is unfortunate, it was not unavoidable. When the Hegars purchased the

6

85-acre property from Curbo in 2002, they chose to build their home a mere 200 to 300 yards away from the roadway that Key Operating had been using since 1994 and had spent over $150,000 to build and maintain.

For these reasons, I respectfully dissent.


Jim Sharp
Justice

Panel consists of Chief Justice Radack and Justices Sharp and Brown.

Justice Sharp, dissenting.